Kenneth B. GOLDING, Plaintiff,

v.

UNITED STATES, Defendant.

No. 95–249C.

United States Court of Federal Claims.

March 1, 2001.

Louis P. Font, Font & Glazer, Brookline, Massachusetts, attorney of record for the plaintiff.

Paul D. Hoburg and John S. Groat, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., with whom were James M. Kinsella, Deputy Director, David M. Cohen, Director, and Frank W. Hunger, Assistant Attorney General, attorneys of record for the defendant. Lieutenant Colonel Daniel M. Lizzul and Lieutenant Sherry Sabol, Department of the Navy, of counsel.

## OPINION

HORN, Judge.

This case comes before the court on defendant's motion to dismiss, or, in the alternative, for summary judgment and plaintiff's cross-motion for summary judgment. Plaintiff enrolled as a midshipman at the United States Naval Academy on July 2, 1985. Academically, he performed acceptably at the Naval Academy, participated in the political science honors program, and pursued a number of extra-curricular activities. In the summer before his junior year plaintiff developed pneumonia. He was eventually diagnosed with reactive airways disease, chronic sinusitis/rhinitis, allergy to grasses, and mild asthma. Over the course of the next fifteen months after the onset of his illness, plaintiff was treated with a number of different medications, but continued to complain that the treatment was ineffectual. On September 26, 1988, plaintiff was involuntarily hospitalized at the National Naval Medical Center, Bethesda, MD, with an admission diagnosis of adjustment disorder and major depression. Plaintiff was eventually processed for discharge from the Naval Academy and the United States Navy, based on physical disqualification. The primary diagnosis was major depression, single episode, severe without psychotic features, not existing prior to entry into the Naval Academy. Plaintiff argues that it was the treatment for his chronic bronchial problems, particularly the interaction of the various drugs he was given over time, which caused his depression. Plaintiff was involuntarily discharged from the United States Naval Academy, and received an honorable discharge from the United States Navy effective March 27, 1989.

In the complaint filed in this matter on March 22, 1995, plaintiff requests back pay and allowances for the period from March 27, 1989, the date of his honorable discharge, to the present; that his discharge be voided and that he be restored to active duty; and that he be granted his diploma from the Naval Academy. Plaintiff alleges in count one of the complaint that the Navy violated the United States Constitution and various statutes and Navy regulations. Count two alleges violation of 10 U.S.C. § 6961 (1988) and SECNAV INSTRUCTION 1531.1A, dated March 13, 1989, which require the approval of the President of the United States before a midshipman may be discharged from the

Naval Academy and the Naval Service. Count three alleges violation of 10 U.S.C. § 1201, *et seq.* (1988), "Retirement or Separation for Physical Disability," and other applicable regulations which provide for a formal hearing, with a right to be represented by counsel, to determine if discharge, separation, or retirement based on disability is appropriate, or to what extent a disability would interfere with active military service, and whether such disability is temporary or permanent. Count four alleges a violation of the Rehabilitation Act of 1973, 29 U.S.C. § 794, *et seq.* (1988), alleging failure to accommodate plaintiff's disability, thus, unlawfully ending plaintiff's entitlement to pay and allowances. Count five alleges defendant violated the military's equal employment opportunity program, 32 C.F.R. Part 51 (1988), by discriminating against plaintiff and discharging him on the basis of his alleged disability, in violation of law, thereby ending his entitlement to pay and allowances. Plaintiff alleges in count six that 10 U.S.C. § 1217 (1988), which excludes midshipmen from being evaluated and compensated under the Navy's physical disability system described at 10 U.S.C. § 1201, *et seq.*, is unconstitutional. Defendant filed a motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(4) of the Rules of the United States Court of Federal Claims (RCFC). In the alternative, defendant moved for summary judgment. Plaintiff has filed a cross motion for summary judgment pursuant to RCFC 56.

## FINDINGS OF FACT

Plaintiff, Kenneth B. Golding, applied for appointment to the United States Naval Academy, and, on June 7, 1985, received an offer of a Presidential appointment, which he accepted on June 14, 1985. He reported to the Naval Academy to begin his training on July 2, 1985. While at the Academy, plaintiff participated in numerous extra-curricular activities, as well as achieving a 3.03/4.00 overall grade point average through his third year at the Academy. In addition, plaintiff was selected for the honors program in political science at the beginning of his second year. Prior to plaintiff's entry into the Academy, there were no documented physical or mental problems.

In mid-June, 1987, plaintiff began experiencing a severe sore throat, which progressed to his having trouble breathing. Plaintiff was at first diagnosed with an upper respiratory infection, but on June 23, 1987, he was diagnosed with right middle lobe pneumonitis, as confirmed by chest x-ray. Plaintiff's pneumonia was considered to be resolved as of July 22, 1987. From June 23, 1987 through July 22, 1987, when x-rays showed no further presence of infiltrate in the lungs, plaintiff was seen a total of ten times by health care providers. With the exception of abdominal cramps on June 24, 1987, plaintiff's complaints were related to coughing, congestion, head pain, and tightness in his chest, except for the last visit on July 22, 1987, which was to follow up on pain in his neck and back.

Over the course of thirteen months, from August 15, 1987 to September 22, 1988, plaintiff was seen close to sixty times on an outpatient basis primarily by doctors but also by corpsmen and physician assistants for various complaints relating to symptoms which did not abate after plaintiff's pneumonia was considered to have been resolved, until he was admitted as an inpatient. Upon his return to the Academy in August, 1987, plaintiff was excused from exercise for one month. On September 8, 1987, plaintiff was referred by Commander (Dr.) Sanders, at the Bancroft Hall Clinic, for an ear, nose and throat (ENT) consultation, because plaintiff was "no better, nasal drip [and] pain in head." On September 13, 1987, Lieutenant Commander (Dr.) Curtin examined plaintiff. He found plaintiff's sinuses were blocked, there was slight redness in his throat, and he heard rales[1] in plaintiff's lungs. He noted that plaintiff was "not satisfied [with] medical care." Dr. Curtin followed up with plaintiff the next day. Dr. Curtin saw plaintiff again on September 22, 1987. Dr. Curtin heard coarse respiratory sounds again.

---

**1.** Rales—abnormal respiratory sounds. *Dorland's Illustrated Medical Dictionary* 1408 (28th ed.1994).

Plaintiff had been seen twice in September, 1987, for physical therapy to establish a reconditioning program to get him back into shape for running. The physical therapy program was primarily for plaintiff to perform various activities, as tolerated. On September 28, 1987, plaintiff was discontinued from physical therapy due to lack of attendance. Plaintiff contested this in his medical records, stating he discontinued therapy due to a "lack of sufficient program to follow," and that he would develop his "own program."

On October 6, 1987, plaintiff was seen by Captain (Dr.) D.H. Thompson, a Navy otolaryngologist[2] at Bethesda Naval Hospital's ear, nose, and throat (ENT) clinic. His examination of plaintiff showed his ears, nose, throat, and sinuses all within normal limits. Dr. Thompson ruled out sinus disease. Chest x-rays raised the question of whether plaintiff might have mild cardiomegaly.[3] Plaintiff was referred to a cardiologist, who ruled out cardiomegaly, but who suggested that plaintiff's problems appeared to be consistent with a broncho-pulmonary problem.

Also on October 6, 1987, plaintiff was seen by Captain (Dr.) Robert Sarlin, a Navy pulmonary/internist. This was the first of many outpatient visits with Dr. Sarlin from October 1987 through August 1988. Dr. Sarlin tested plaintiff's pulmonary function before and after use of bronchodilators,[4] and concluded that plaintiff showed "no significant response to inhaled bronchodilator," and that he probably had "post infectious obstructive airways disease," and possibly reactive airways disease (RAD). He prescribed a trial short course of Prednisone for ten days.[5]

On October 9, 1987, Dr. Curtin reviewed Dr. Sarlin's report and added Anaprox[6] to plaintiff's medications, which then consisted of Proventil, Humibid, and Prednisone.[7] On October 16, 1987, plaintiff saw Dr. Sarlin again. Dr. Sarlin noted plaintiff had mild obstructive airways disease, with a complaint of chronic post nasal drip, and that he had shown "minimal improvement except cough improved" from the course of Prednisone.

Dr. Thompson (ENT) saw plaintiff again on October 30, 1987. Plaintiff's complaints were noted as "1) Cannot breath[e] on [right] side in area of oropharynx but can breathe ok in Left Side in oropharynx. This [symptom] all of the time. 2) Headaches all around Head [for] 3–4 weeks [unintelligible] Severe. . . ." Dr. Thompson noted plaintiff's previous ENT exam of October 16, 1987, was within normal limits, and that a sinus x-ray had shown nothing. He performed another ENT exam, and noted the findings were again within normal limits.

On November 13, 1987, plaintiff had a follow-up appointment with Dr. Curtin. Dr. Curtin's assessment was that plaintiff had post nasal drip and reactive airways disease. He ordered two bacteriology examinations and referred plaintiff to the allergy clinic. The bacteriology results showed plaintiff's sputum contained bacteria.

On November 23, 1987, Commander (Dr.) Rosenblatt of Bethesda Naval Hospital test-

---

2. Otolaryngology—"that branch of medicine concerned with medical and surgical treatment of the head and neck, including the ears, nose, and throat." *Dorland's Illustrated Medical Dictionary* 1205 (28th ed.1994).

3. Cardiomegaly—enlargement of the heart. *Dorland's Illustrated Medical Dictionary* 268, 802 (28th ed.1994).

4. Bronchodilator—expanding the air passages of the lungs. *Dorland's Illustrated Medical Dictionary* 231 (28th ed.1994).

5. Prednisone is categorized as a glucocorticoid. A potential adverse reaction to glucocorticoids is depression. It does not appear, however, that plaintiff was given Prednisone for any period other than the prescribed ten-day course.

6. *The Physician's Drug Handbook* lists, e.g., drowsiness as one of the potential adverse reactions to Anaprox, but depression is not listed. *The 1989 Physician's Drug Handbook* 677 (Springhouse Corp.1989) [hereinafter *The 1989 Physician's Drug Handbook*]. Extracts from *The 1989 Physician's Drug Handbook* were submitted by the parties with their joint stipulations of fact.

7. Prednisone was discussed above. *The Physician's Drug Handbook* lists, e.g., drowsiness as one of the potential adverse reactions to both Proventil and Humibid, but depression is not listed for either. *The 1989 Physician's Drug Handbook* 24, 465.

ed plaintiff for allergies. Dr. Rosenblatt noted the plaintiff had a history of reactive airways disease. Plaintiff's allergy testing showed him to be allergic to several grasses and a mold. Dr. Rosenblatt noted, however, that there did not appear to be an allergic component to plaintiff's problems. Dr. Rosenblatt's findings were reviewed by Commander (Dr.) David Goodman, the head of the Allergy–Clinical Immunology Division at Bethesda Naval Hospital. Dr. Goodman reviewed the plaintiff's chart and x-rays, with plaintiff, on December 4, 1987, including the recent ENT and pulmonary assessments by Drs. Thompson and Sarlin. He stated that he concurred with their evaluations, diagnoses, and treatment plans. He added that the only further treatment suggestion he could add would be nasal saline irrigation.

On November 27 and December 3, 1987, plaintiff made his third and fourth visits to Captain Sarlin. The November 1987 visit showed plaintiff still with a chronic cough which increased especially after exercise, and mild sputum production after exercise. Plaintiff was again given pulmonary function tests, and Dr. Sarlin reported his condition as "Obstructive Airways Disease—Rule Out Reactive Airways Disease with meth[acholine] challenge [test]." On December 3, 1987, plaintiff was given the methacholine challenge, and this test was positive for reactive airways disease. A "sinus series" was negative. Dr. Sarlin's diagnosis was "1. Reactive Airways Disease, 2. sinusitis/rhinitis, chronic." Dr. Sarlin prescribed the medications Theo–Dur, Ventolin, and Intal.[8]

On December 23, 1987, while plaintiff was at home on holiday break from the Naval Academy, he went to the emergency room at Bethesda Naval Hospital. His chief complaints were listed as reactive airways disease and a sore throat. The examining physician noted a sore throat, "chronic mild upper respiratory illness with congestion, minimal nasal discharge, non-productive cough, undocumented fever and chills." The doctor ordered a series of tests, to include a test to determine the theophylline level in the blood. The result was 6.1 mcg/ml. A therapeutic range for theophylline is 10–20 mcg/ml. The doctor increased plaintiff's Theo–Dur dosage. The doctor's diagnosis was bronchitis. Plaintiff took theophylline from December 3, 1987, to October 15, 1988. Plaintiff's theophylline level was checked on December 23, 1987, as noted, and on September 30, 1988.

Plaintiff saw Dr. Sarlin on December 29, 1987 for the fifth time. Plaintiff complained he was not exercising, and felt "down," and "under stress." Dr. Sarlin had plaintiff undergo an EKG, which showed a frequent abnormal beat. Dr. Sarlin saw plaintiff again on January 14, 1988, for the sixth time. The doctor's evaluation remained mild asthma and chronic rhinitis. Dr. Sarlin recommended another ENT evaluation to rule out a mechanical obstruction. That same day, plaintiff again saw Dr. Thompson at the Bethesda Naval Hospital ENT clinic, who noted this was a follow-up visit, and that no pathology was found at the previous visit. The doctor's notes again show a normal examination. After these examinations, plaintiff was maintained on Theo-Dur, Proventil, Vancenase, and Intal.[9]

Ten days later, on January 24, 1988, plaintiff was seen for evening sick call, with a notation that he was having trouble breathing, spasms, and cramps. Dr. Sanders examined plaintiff, who stated that the pain was "located in the back of his lungs." Dr. Sanders found that plaintiff's lungs were clear, and that plaintiff had "acute thoracic spasm." Plaintiff was instructed to return to the clinic, and did so on January 29, 1988. Dr. Sanders noted plaintiff was having problems getting his breath, was constantly clearing his throat, and exhibited nasal congestion. Dr. Sanders observed that plaintiff's lungs and airways were clear, and his throat was

---

**8.** *The Physician's Drug Handbook* lists, e.g., dizziness, as one of the potential adverse reactions for both Ventolin or Intal, but does not list depression for either. Depression is listed as one of the potential adverse reactions to Theo–Dur. *The 1989 Physician's Drug Handbook* 24, 264–65, 931.

**9.** *The Physician's Drug Handbook* lists, e.g., hoarseness as one of the potential adverse reactions to Vancenase, but depression is not listed. *The 1989 Physician's Drug Handbook* 111. The other prescriptions were discussed above.

"OK." Dr. Sanders noted chronic rhinitis, and wrote "consider psychology assistance."

On February 1, 1988, Dr. Sanders requested a psychology consultation for plaintiff. He stated: "[Plaintiff] [with] upper res[piratory] problems for some time. I feel he has a significant depression because of it which compounds his symptoms. Medically some reactive airway disease [and] rhinitis." On February 2 and 5, 1988, plaintiff saw Lieutenant Barbara Dobson, a clinical psychologist at the Midshipmen Counseling Center. Plaintiff described the progression of symptoms from July 1987. Her report indicates plaintiff was "generally dissatisfied with [the] lack of physical findings other than diagnosis of 'mild obstructive airways.'" Plaintiff complained of continually being "knocked down" so that he could not reach his goals. In addition, plaintiff complained that "1) running exacerbates condition; 2) having a hard time studying, [decreased] concentration, interruptions because he has to spit mucus (6–10 [times][per hour]); 3) feels alone, not supported, angry at medical; 4) increased [headaches] and sore throats; 5) feels tired; [and] 6) frustrated at waking up 'miserable' every day." Plaintiff expressed concern about being able to "handle it here, being sick." Lt. Dobson's impression was that plaintiff had an "adjustment disorder with mixed emotional features."

Dr. Sanders saw plaintiff again on February 22, 1988, because of plaintiff's complaint of "[left] sided chest pain, sharp shooting, entire left chest, front and back, extending to left upper abd[omen] ...." Dr. Sanders prescribed Motrin and application of heat to the chest. Three days later, on February 25, 1988, plaintiff went to the evening sick call at the Naval Academy. He complained that he could not sleep, was feeling "stressed out," and was shaking. Plaintiff was kept overnight, with a referral for a psychology consultation in the morning. Dr. Sanders saw plaintiff the next morning, and wrote that plaintiff was "acutely agitated, depressed, has not slept for several days." He pre-

scribed Elavil,[10] an antidepressant, and stated he would continue to work with Lieutenant Dobson. On March 2, 1988, Dr. Sanders changed plaintiff's antidepressant medication to Norpramin.[11]

Plaintiff told Dr. Sanders he wanted a second opinion from a civilian doctor regarding his respiratory condition. During spring break, on March 8, 1988, plaintiff consulted with Dr. Harold Silver, an internist and board certified pulmonologist. Dr. Silver performed tests and physically examined plaintiff, as well as interviewing him about his medical history. Dr. Silver found "significant small airways disease," and requested that plaintiff be excused "from most vigorous forms of physical activity [un]til this is resolved." Dr. Silver's diagnostic impression was "chronic bronchitis post infection" that was "aggravated by the fact that [plaintiff] had some element of allergy in [his] family history and [plaintiff's] IGE level indicate[d][an] allergy at present may contribute." Dr. Silver also stated plaintiff had difficulty because "[plaintiff's] opportunity to convalesce after this has been minimized, and [plaintiff has] tried to recover and at the same time do physical and intellectual tasks full blast. As a result of this, [plaintiff has] suffered anxiety and depression." Dr. Silver thought that "[w]hile antidepressant medication may seem superficially good, ... a more understanding attitude in respect to your illness and examination by a psychiatrist and a discussion with somebody about your problem might be a better way to handle it."

On March 14, 1988, plaintiff saw Dr. Sarlin for the seventh time. In response to Dr. Silver's evaluation, Dr. Sarlin wrote: "[E]xcuse Midshipman Golding from running or any strenuous exercise, [illegible] airways disease with apparent exercise induced component. He is under evaluation in Pulmonary Clinic." On April 8, 1988, Dr. Sanders saw plaintiff again, and noted he still had "pain in 'lungs' with coughing or sneezing, min[imal] [shortness of breath] with climbing stairs,

**10.** *The Physician's Drug Handbook* lists, e.g., drowsiness as one of the potential adverse reactions to Elavil, but depression is not listed. *The 1989 Physician's Drug Handbook* 55.

**11.** *The Physician's Drug Handbook* lists, e.g., drowsiness as one of the potential adverse reactions to Norpramin, but depression is not listed. *The 1989 Physician's Drug Handbook* 295.

had numbness of entire body one evening." Dr. Sanders noted the medicines plaintiff was taking—Theo-Dur, Proventil, and Norpramin. Dr. Sanders observed that plaintiff's lungs were clear, and wrote that plaintiff had "chest wall pain." He prescribed Anaprox for ten days. On May 9, 1988, plaintiff's blood was drawn to determine therapeutic levels for Norpramin.

Plaintiff was referred to outpatient psychiatry at Bethesda Naval Hospital on May 17, 1988. He saw Commander (Dr.) Roger Pentzien, a psychiatrist and head of the outpatient psychiatry section at the hospital. Dr. Pentzien discussed plaintiff's situation at length with Lieutenant Dobson at the Academy prior to meeting with plaintiff. Dr. Pentzien noted plaintiff's history as "consistent with a somewhat ATYPICAL DEPRESSION marked by a decided tendency toward somatization,[12] though it was not entirely unclear that he might indeed suffer from some mild upper airway disease that was worsened in the throes of stress." (emphasis in original). He noted plaintiff "had generally benefitted from a combination of bronchodilators and antidepressant medication" and that "he was scheduled for a gradual decrease of the antidepressant medication to assess [plaintiff's] level of functioning free from the drug; this was of particular import as [plaintiff] was preparing for a summer cruise in Long Beach, CA." Plaintiff was noted as functioning in the "above average to superior level of intelligence." Dr. Pentzien noted plaintiff did have "some continuation of mild to moderate posterior pharyngeal discomfort," and there was "no indication of delusional content to his complaint." Dr. Pentzien's conclusion, after three meetings with plaintiff and a gradual downward titration of his medication, was that plaintiff suffered from an "atypical depressive disorder, treated, resolving. Psychological factors affecting physical disorder, mild upper airway disease NCD [not considered disabling], treatment in progress." Dr. Pentzien concluded that plaintiff was to complete the discontinuation of his antidepressant medication, and that he would be followed closely by Lieutenant Dobson on his return to the Academy. Dr. Pentzien's report was dated June 7, 1988.

On June 13, 1988, while at Long Beach, California, for his summer cruise, plaintiff reported to the ship's clinic and was examined by a corpsman there. The corpsman noted plaintiff's symptoms were "coughing up mucous (green and yellow and white), congestion, runny nose, dizziness, pain in lungs upon inspiration and recurrent sore throat for approximately five to six days." The corpsman heard rales in plaintiff's lungs. The corpsman had plaintiff transported to the Naval Clinic at Long Beach for further evaluation. There, a physician's assistant also heard mild rales in plaintiff's lungs. The physician's assistant ordered a chest x-ray. Plaintiff was diagnosed with bronchitis. On June 30, 1988, plaintiff was seen by Dr. J.S. Vasser, at the Naval Medical Clinic, San Diego, California. Plaintiff complained of an "occasional sharp pain over his right shoulder which can be brought on by breathing through the nose or sneezing." Dr. Vasser noted plaintiff's lungs were clear, and he assessed plaintiff as having musculoskeletal thorax pain with an upper respiratory infection. He prescribed Motrin and Entex L.A. for ten days each. On August 9, 1988, plaintiff saw Dr. Sarlin for the eighth time. Plaintiff still complained of "frequent bilateral chest pain," "chest tightness, aggravated by 'air pollution,'" "exercise induced cough," and wheezing with shortness of breath. Dr. Sarlin's assessment was that plaintiff had mild reactive airways disease aggravated by exercise. He continued plaintiff's medications, and prescribed Intal, to be added to the regimen of Theo–Dur and Proventil. On August 19, 1988, plaintiff saw Dr. Sarlin again. Plaintiff still complained of persistent sinus and nasal congestion, exercise tightness, cough, and a nocturnal cough. Dr. Sarlin observed plaintiff's lungs were clear, with no wheezing. His assessment was that plaintiff suffered from mild asthma with primarily nasal rhinitis symptoms and mild exertional chest tightness. Dr. Sarlin continued the Theo–Dur and Proventil pre-

12. Somatization—"in psychiatry, the conversion of mental experiences or states into bodily symptoms." *Dorland's Illustrated Medical Dictionary* 1544 (28th ed.1994).

scriptions, prescribed Intal again, and added Vancenase, Humibid,[13] and Ventolin.

On August 25, 1988, plaintiff was seen by Dr. Nowicki at the Bancroft Ambulatory Care clinic at the Academy. Plaintiff was seeking a medical excuse from exercise. He informed Dr. Nowicki of his asthma, and that he was having coughing and tightness when running. Dr. Nowicki examined plaintiff, finding his lungs clear. Dr. Nowicki provided plaintiff a medical excuse for two weeks. Plaintiff saw Dr. Nowicki again on September 22, 1988. Plaintiff asserted that he was still having difficulties with breathing and sleeping, stating that he "awakes and worries." Dr. Nowicki noted plaintiff was being followed by the Counseling Center. Dr. Nowicki gave plaintiff a 30–day medical excuse from exercise, and prescribed Restoril.[14]

On September 26, 1988, Lieutenant Dobson, at the Counseling Center, referred plaintiff to Dr. Pentzien at the outpatient psychiatric clinic at Bethesda Naval Hospital. Dr. Pentzien examined plaintiff, and believed he needed to be involuntarily admitted for inpatient treatment. Plaintiff was hospitalized on September 26, 1988, and remained an inpatient until discharged on December 5, 1988. Plaintiff's admission request form gives plaintiff's diagnosis as "[a]djustment [disorder], Major Depression." At the time of plaintiff's admission he was taking Ventolin, Intal, Vancenase, Humibid, Theo-Dur, Proventil, and Restoril. The prescriptions for the latter three were continued from the date of his admission; the other medications were stopped, without tapering, at admission.

On the day of admission, September 26, 1988, plaintiff's initial attending psychiatrist, Lieutenant Commander Anita Clayton, interviewed plaintiff. Her admission note states:

> [P]atient is a 20 [year old][Academy Midshipman/Active Duty/Navy] admitted [with] depression. [Symptoms] apparently began [with] somatic complaints 1½ years ago [primarily] involving pulmonary [symptoms] (infection, cough, asthma) and cardiac complaints (palpitations, chest pain) without identified organic etiology.[15] [Patient] was felt to be depressed and in Feb [19]88 begun on Elavil, [changed] in Mar[ch][19]88 to [N]orpramine 150 mg [per evening] with measured therapeutic levels of 100. He remained on [N]orpramine until June [19]88 with gradual taper to [discontinuance]. During this [treatment], [patient] cont[inued] to [complain of] somatic [symptoms]. Since June his depression has [increased] [with] poor sleep (initial [and] terminal insomnia [and] restlessness), [decreased] energy, feelings of worthlessness [and] social isolation.

> \* \* \* \* \* \*

> [Plaintiff] is neatly dressed in uniform appearing his stated age [20 years old]. He is very bradykinetic[16] [with] slow movements [and] turning his body as a unit. No abnormal movements or tremors noted. Speech [with] *prolonged* latency, soft in tone [and] volume [with] slow rate. Mood "worried," "in pain." Affect: depressed—appeared near tears throughout the interview.... Judgment fair, Insight: poor. (Emphasis in original.)

Dr. Clayton's impression was "atypical depression [with] somatic complaints as depressive equivalent [with] depressed mood, sleep disturbance, [and] feelings of worthlessness." Dr. Clayton noted only partial response to Norpramin when plaintiff had been prescribed this medication earlier in the year, and she recommended consideration of Prozac, nortriptyline, or lithium carbonate as antidepressants.

Lieutenant Beth Grossman, a psychology intern,[17] was assigned as plaintiff's primary

---

**13.** *The Physician's Drug Handbook* lists, e.g., drowsiness as one of the potential adverse reactions to Humibid, but depression is not listed. *The 1989 Physician's Drug Handbook* 465.

**14.** *The Physician's Drug Handbook* lists depression as one of the possible adverse reactions to Restoril. *The 1989 Physician's Drug Handbook* 915.

**15.** Organic—pertaining to or arising from the organs. *Dorland's Illustrated Medical Dictionary* 1189 (28th ed.1994). Etiology—"the causes or origin of a disease or disorder." *Id.* at 585.

**16.** Bradykinetic—characterized by slow movement. *Dorland's Illustrated Medical Dictionary* 223 (28th ed.1994).

therapist. On September 26, 1988, Lieutenant Grossman wrote an intake note regarding plaintiff, which was reviewed by Lieutenant Commander (Dr.) Schraml, a psychiatry resident. In the report Lieutenant Grossman states: "The patient's difficulties began approximately one and a half years ago with somatic complaints including reactive airway disorder, chronic rhinitis, bronchitis, palpitations and chest pain. All symptoms were without identified organic etiology." After noting that plaintiff had been placed on antidepressants earlier in the year, she stated, "[h]e remained on norpramine until June, 1988 with a gradual taper to discharge. During this time, the patient continued to complain of somatic symptoms. Since June [1988] his depression has increased and is marked by difficulty falling asleep, decreased energy, feelings of worthlessness and social isolation."

Lieutenant Commander (Dr.) Clayton, plaintiff's initial attending psychiatrist, reviewed the record on September 29 and 30; October 5, and 7; November 23 and 25, 1988, and concurred with the management of plaintiff's case. Lieutenant Commander (Dr.) Hoyle, plaintiff's attending psychiatrist, annotated the inpatient record as having either seen plaintiff or concurred in the management of the case, or both, on numerous occasions between October 2 and December 8, 1988, during plaintiff's hospitalization. Lieutenant Commander (Dr.) Schraml, a psychiatric resident, again reviewed Lieutenant Grossman's actions and notes on September 28, 1988, after Lieutenant Grossman had decided to place plaintiff under close observation status. Lieutenant Commander Schraml made notes regarding review of the chart, treatment plaintiff was receiving or his own interaction with plaintiff or with other staff regarding plaintiff's case, or concurrence in entries by other staff, on numerous occasions between September 27 and November 16, 1988. Notes also were made by other psychiatric residents and attending psychologists reviewed the notes from psychology interns and added their own comments to the record while plaintiff was hospitalized.

Plaintiff was started on nortriptyline,[18] an antidepressant, on September 27, 1988. Dr. Schraml's note states, with regard to use of nortriptyline, the indications, potential side effects, and alternative therapies were discussed with plaintiff.[19] On September 28, 1988, plaintiff acknowledged his psychiatric problems, which was considered to be a positive step. On September 30, 1988, plaintiff was experiencing musculoskeletal pain to the point that he was requesting narcotics for the pain. Plaintiff's subjective pain complaints were that the pain would get "intense" and "unbearable." In another notation in plaintiff's medical record, plaintiff gave the following description of his pain: "The pain from my reactive airways is just so intense that it is hard for me to talk and concentrate as I normally do. I've tried using concentration techniques to decrease the pain but they have not worked that well. I'm not sure if some of the pain isn't psychosomatic but I know there is a real physical problem." "People think I'm talking slow because I'm depressed but I'm concentrating on the pain in my airways." Plaintiff was given Tylenol for the pain. Medical personnel believed plaintiff's focus on medical causes of his hospitalization reflected poor insight into his actual illness, and that as he confronted issues contributing to his depression, his somatic complaints might lessen.

Plaintiff's theophylline (Theo-Dur) level was tested on September 30, 1988. At about the same time that plaintiff reported unbearable pain in his chest (September 30, 1988), plaintiff's respiratory medications were being decreased. Ventolin, Vancenase, Intal, and

17. Lieutenant Grossman received her Ph.D. degree after submission of her dissertation in 1990.

18. *The Physician's Drug Handbook* lists, e.g., drowsiness as one of the potential adverse reactions to nortriptyline, but depression is not listed. *The 1989 Physician's Drug Handbook* 701.

19. Over the course of plaintiff's hospitalization, plaintiff complained several times that the medications he was being given, primarily the antidepressants, were not working. Plaintiff also felt that being confined as an inpatient was not helping him or his symptoms. He continued to maintain that his problems were strictly respiratory, and that his treatment was not appropriate to address those symptoms.

Humibid had all been stopped, and plaintiff's dosage of Proventil was reduced to "as needed."

Plaintiff also talked to Dr. Schraml on October 3, 1988, and described symptoms which were attributable to the side effects of nortriptyline. Dr. Schraml explained this to plaintiff, and that they would be monitoring the blood level of nortriptyline to monitor plaintiff's response to it. Plaintiff's blood was drawn on October 5, 1988, five days after starting nortriptyline. On October 11, 1988, the results showed plaintiff's nortriptyline level was 91 ng/ml, within the therapeutic range of 50–150 ng/ml.

Plaintiff was seen by pulmonary specialists during his hospitalization, including Dr. Sarlin. On October 6, 1988, plaintiff was seen by Lieutenant Commander (Dr.) Ashburn, a pulmonologist. Dr. Ashburn recommended increasing plaintiff's theophylline (Theo-Dur) dosage. The next day, Dr. Clayton reviewed the chart and wrote that she did not agree with an increase in theophylline dosage. She stated she would "[discontinue] for medical indications and reinforcement of somatic complaints." Later that evening, Dr. Schraml wrote,

> [D]iscussed [the] pulmonologist's recommendation to [increase] Theophylline. In light of [patient's] relatively mild pulmonary problems and apparent temporal association between his current [symptoms] and anxiety (with a clear lung exam to auscultation) [plus] psychiatric [symptoms] sometimes associated [with] theophylline [plus] the possibility of reinforcing [patient's] somatic symptomology related to his psychiatric condition, will maintain current [prescription] regimen until [patient] can be evaluated by Dr. Sarlin, the pulmonologist who has been following [Midshipman] Golding. Dr. Sarlin will see the [patient] on 11 Oct 88.

On October 9, 1988, Dr. Schraml noted plaintiff could not "discern between negative thoughts involving 'no goals' and worry that

he is not going to get better, and an actual voice in his head telling him these negative things. He reports concern that he may actually be having auditory hallucinations. He experiences these thoughts or voices when he is alone . . . and has noted these [for approximately] one week. He has no prior [history] of auditory hallucinations." On October 10, 1988, plaintiff told Lieutenant (Dr.) McNeil that "he frequently experiences negative thoughts about himself but denied hearing voices." Lieutenant Grossman, plaintiff's therapist, noted on October 11, 1988 that "[patient] discussed feelings of disappointment in himself for 'failing' at Naval Academy. Also discussed 'voices' he hears. [Patient] had difficulty describing them. Talked to Dr. Schraml regarding 'voices'—agree that they are an obsessive response to [patient's] feelings of inadequacy [and] failure."

On October 13, 1988, Dr. Ashburn wrote that "[patient's] home team would like to [discontinue] his Theophylline compound, as his physicians seem to think it may be contributing to his [symptoms] complex. I have no objection to this." He also wrote, "the lack of any documented wheezing makes me think his dyspnea[20] is, at times, a manifestation of anxiety, and not [secondary] to reactive airway [disease]." Plaintiff's theophylline was discontinued on October 15, 1988.

On October 13, 1988, plaintiff's medical records reflect that he was informed of the decision to initiate discharge action. Plaintiff stated he would like to take time off and then return to the Naval Academy. Plaintiff was adamant that he wanted to return to the Academy, stating he enjoyed the feeling of fraternity. Lieutenant Grossman noted that part of the plan in plaintiff's case was a Medical Board. On October 14, 1988, Dr. Hoyle noted that a Medical Board was "in process."

On October 14, 1988, the decision was made by Dr. Schraml to take plaintiff off Restoril, and place him on Ativan.[21] Plaintiff

---

**20.** Dyspnea—"difficult or labored breathing." *Dorland's Illustrated Medical Dictionary* 518 (28th ed.1994).

**21.** As with Restoril, *The Physician's Drug Handbook* lists depression as one of the possible ad-

verse reactions to Ativan. *The 1989 Physician's Drug Handbook* 566.

was manifesting anxiety. Dr. Schraml wrote that, "[w]hile [N]ortriptyline may exacerbate [symptoms]/signs of anxiety, doubt it is etiological in that [symptoms]/signs clearly existed at time of admission (i.e. before beginning [antidepressants]). Will begin Ativan—1 mg [three times per day] with plan for taper and [discontinue] once significant clinical response to [antidepressants] is realized (or to other antidepressant therapy)." When plaintiff's prescription of Restoril was stopped, Ativan was started. Plaintiff was started on Ativan on October 15, 1988, and maintained on Ativan through November 20, 1988.

Plaintiff was referred for psychological testing on September 30, 1988, and was tested on October 4, 1988. In a report dated October 17, 1988, Lieutenant Bryce Lefever, a psychology intern, submitted results of the testing, which were approved by Lieutenant Commander Wally Campbell, a clinical psychologist. The conclusion of the report was that plaintiff was suffering from a "severe, incapacitating obsessive personality style which severely inhibits decision making, taking action, and finishing tasks." As part of the clinical interview, plaintiff stated that "his bronchi" are particularly reactive to jogging and other exercise. Plaintiff believed that, because of this, he would not be able to work out enough to pass the physical fitness running test, and, therefore, would not reach his goal of graduating from the Academy and becoming a Naval officer. Plaintiff reported that, since June [of 1988, when he was taken off antidepressants prior to his summer cruise] his depression has increased while his appetite and sleep have decreased. He also reported a decrease in concentration and extreme difficulty making decisions. Plaintiff was given a clinical interview, mental status examination, the Rorschach ink blot test, the Minnesota Multiphasic Personality Inventory (MMPI), the Rotter Sentence Completion test, and the Beck Depression Inventory.

The testing indicated plaintiff's judgment was considered fair, his insight poor, and that plaintiff was experiencing a degree of stress beyond his ability to cope. It took him over an hour to complete two questionnaires others normally completed in twenty minutes. He never completed the Rotter Sentence Completion form. Clinical observation included plaintiff's "thinking/obsessing about things '24 hours per day.'" His self-appraisal was, "I used to be pretty goal oriented, independent, and have a high belief in myself. But when I developed these airways, my confidence level dropped, my ability to achieve my goals dropped." The MMPI results indicated a tendency to "somaticize psychological conflict and stress and to consistently and rigidly misapprehend the source of his psychological distress as physical in origin." Plaintiff's self-scored Beck Depression Inventory indicated that he was severely depressed. The recommendations at the conclusion of the report, included: "3. Although this patient is not currently suicidal, and has no significant history of suicidal thoughts or behavior, due to the severity of his depression and to facing the possible loss of his career, suicidal threats, gestures, or attempts could possibly emerge." and "4. This patient's personality disorder is so severe that it is disabling. Consider that a career as a Naval officer might not be best for an individual who has extreme problems with indecisiveness, anxiety and depression."

Dr. Sarlin's note from October 19, 1988, is extensive. Dr. Sarlin was asked to comment on plaintiff's pulmonary diagnosis and current status. He stated:

Ken [Golding] is well known to me with a complicated mix of multiple somatic complaints evolving over the past year to year [and a half]. External evaluation by myself and other consultants including allergy, ENT [and] cardiology have failed to identify any single disease process that would explain all of his [symptoms]. His workup did demonstrate a component of obstructive airways disease on pulmonary function testing. His degree of obstruction is felt to be mild [and] primarily involves the small airways. A *methacholine challenge test* was performed on 3 Dec. 87 and considered *positive* consistent [with] hyperactive airways disease (asthma). However, his disease appears to be mild [without] severe exacerbations or frequent episodes of acute bronchospasm (no audible wheezes have been documented on repeated exams). He has been treated [with] a variety of antiallergic [and] bron-

chodilator medications including a short course of steroids [with] minimal response. In other words, his [symptoms] continued despite optimal medical therapy for his reactive airways disease. Currently, his disease is "quiescent" [and] largely subclinical [and] should respond well to inhaled bronchodilators [and] cromolyn before exercise.

Hi[s] major somatic complaints including vague chest pains, mucus production [and] inability to clear his upper airway have no clinical basis [and] are largely somatic [and] functional in nature. His inability to run the mile cannot be explained by his reactive airways disease alone—since he rarely demonstrates active bronchospasm.

*Final Impression:*

1) Ken [Golding] has established hyperactive airways disease (asthma) which is largely subclinical [22] [and] should not be significantly limiting at this time.

2) His other major somatic complaints are functional [and] without sound clinical basis (chest pain, excessive mucus, [and] nasal congestion).

3) His airways disease problem is definitely a secondary problem which may have been aggravated by his underlying depression [and] acute situational reaction to chronic stress.

*[Recommend]:*

1) [Discontinue] theophylline since it probably has minimal effect on his [symptoms] [and] may be potentially toxic.

2) Control his RAD [Reactive Airways Disease] [with] inhaled bronchodilators i.e. Albuterol ... [and] Cromolyn ... before exercise. [Emphasis in original.]

On October 28, 1988, Dr. Hoyle noted that plaintiff "[s]till [complains of] depression, physical complaints. Has an unrealistic plan for time off from USNA, eating his own vegetables, and exercise and use relaxation. Consideration for change of medication or augmentation of current antidepressant. His previous response to [D]esipramine [Norpra-

min] needs to be clarified." On November 2, 1988, after speaking with plaintiff's father and plaintiff, Dr. Hoyle noted these same concerns, and stated: "Suggest continued focus on this in psychotherapy. Case discussed at length with Dr. Schraml and Grossman. Concur."

On October 31, 1988, after a little over a month of inpatient treatment, plaintiff's medical record stated: "As discussed in rounds today, [patient] continues to evidence significant signs and [symptoms] of depression including speech latency, psychomotor retardation, anhedonia,[23] and [complaints of] depressed mood [with] corresponding affect. He has shown partial response to [N]ortriptyline following [approximately] 4 weeks at therapeutic level. In light of persistent depression, will augment TCA [Tricyclic Antidepressant] [with] [L]ithium." However, plaintiff and his father did not believe it would be in plaintiff's best interest to take lithium, fearing that it would mean he would not be able to return to the Naval Academy. After discussing plaintiff's refusal to take lithium with Dr. Hoyle, Dr. Schraml noted the new plan was to augment Nortriptyline with Prozac, which "has shown efficacy in the treatment of depressed individuals with obsessive compulsive characterologic features and primarily affects a biochemical different from that primarily affected by [N]ortriptyline. Have discussed the indications, possible side effects of and alternative therapies to Prozac. [Patient] agrees to take this medication."

Dr. Kleiger noted on November 7, 1988, that plaintiff was "preoccupied with leaving hospital and SAH [subsisting at home] while [medical] board is being processed. Rigidly asserts that hospital milieu is not helpful and only makes him more focused on his problems.... While he claims to want to return to the Academy more than anything, he also makes it clear how much he suffered there. This seems to reflect his essential dilemma, his conflict about staying in the [N]aval [A]cademy." On November 14, 1988, Dr.

---

**22.** Subclinical—without clinical manifestation; not detectable by clinical examination or laboratory tests. *Dorland's Illustrated Medical Dictionary* 1594 (28th ed.1994).

**23.** Anhedonia—"total loss of feeling of pleasure in acts that normally give pleasure." *Dorland's Illustrated Medical Dictionary* 83 (28th ed.1994).

Schraml noted that "[patient] on Ativan [approximately] [four] weeks. Doubt continuing therapeutic effect. Will taper and [discontinue]." He was waiting for results of blood tests to determine plaintiff's level of nortriptyline. On that same day, Dr. Schraml notes that "224 [N]ortriptyline level was confirmed by the lab (therapeutic range 50—150) Toxic level ≥ 500. This marked increase in level (i.e. from 91) at same dose may be related to addition of Prozac to pharmacotherapy. The mechanism involved (or possibly involved) is unknown at this time but will be researched."

Dr. Schraml concurred in a plan to reduce the dosage of nortriptyline. Two additional nortriptyline levels were drawn on November 22 and 23, 1988, which showed plaintiff's level at 179 ng/ml and 192 ng/ml, respectively. Plaintiff was noted as tolerating the medication well, but because his blood levels were still outside the therapeutic range, the decision was made to again reduce the dosage of nortriptyline. Dr. Hoyle wrote in plaintiff's record that, "[t]hough outside of therapeutic range—[patient] is not clinically toxic."

On November 30, 1988, plaintiff was provided a copy of the Medical Board Report recommending discharge from the Naval Academy and the Naval Service, to which he submitted a rebuttal. The Medical Board Report summarized plaintiff's history, his hospital course, and the findings and diagnoses. The report noted Dr. Sarlin's evaluation of plaintiff, and stated that a pulmonary specialist "determined that the patient has hyperactive airway disease which is largely subclinical and should not be significantly limiting. He concluded that the patient's somatic complaints are functional and without organic basis, and that his airway disease is secondary to an underlying depression." The report set out the medications given to plaintiff, and noted that plaintiff had reported hearing voices at one point. The report concluded:

After an adequate period of observation, evaluation and treatment, the primary diagnosis was established as Major Depression, Single Episode, Severe without Psychotic Features—DNEPTE [did not exist prior to entry] (DSM III–R 296.23) manifested by depressed mood, psychomotor retardation, insomnia, diminished concentration and feelings of worthlessness. The secondary diagnosis is Obsessive Compulsive Personality Disorder—EPTE (DSM III–R 301.40) as manifested by perfectionism, excessive devotion to work and productivity, and inflexibility.

RECOMMENDATIONS:

The Medical Board concurs with the above findings and diagnoses. It is the opinion of the board that the patient is unable to return to full duty and that he be disenrolled from the U.S. Naval Academy and discharged from the U.S. Naval Service. The Medical Board is further of the opinion that the patient has now received the maximum benefit of military hospitalization and treatment and that has not restored the patient to a duty status.... [T]he Board is of the opinion that the patient is mentally capable of handling his own affairs.

The Medical Board Report Cover Sheet indicates that a copy of plaintiff's health record accompanied the report, as did plaintiff's rebuttal to the report. The members of the Medical Board were Drs. Pentzien, Hoyle, and Schraml. Captain Pentzien saw plaintiff on an outpatient basis before his admission; Lieutenant Commander Hoyle was the attending psychiatrist during plaintiff's hospitalization, and Lieutenant Commander Schraml was the psychiatric resident assigned to plaintiff's case.

Plaintiff was to be followed by Dr. Kleiger in the outpatient psychology clinic at Bethesda Naval Hospital, and his medications were to be monitored by a psychiatrist at the outpatient psychiatry clinic. On December 5, 1988, plaintiff was discharged from the hospital. Over the course of plaintiff's hospitalization, from September 26, 1988, to discharge on December 5, 1988, plaintiff was seen by a number of medical and psychological professionals, including psychiatric staff, psychiatric residents, and pulmonogy specialists. Over one-hundred forty pages of nursing notes from nurses and corpsmen, in addition to the over sixty pages of medical progress notes, reflect the medical attention plaintiff received while an inpatient at Bethesda Naval Hospital.

On December 7, 1988, plaintiff submitted a rebuttal to the Medical Board Report. The narrative of the rebuttal was over six pages long, and plaintiff attached nine pages of additional materials. In his rebuttal, plaintiff indicated that he was only twenty-seven credit hours from receiving his political science degree, and suggested that: "Given several months of convalescence for my present course of medication to take full effect, coupled with self-imposed exercise and appropriate outpatient therapy, I believe that I can learn to manage, control and eventually prevent the reemergence of any activities which previously may have produced somatic effects and that I can fully overcome my diagnosed adversities." Plaintiff's rebuttal further states, in part:

[A]s a result of a consultation by Dr. Dobson with the Bethesda Medical Psychiatric Department, I was placed on an antidepressant which helped me control some of my anxieties and physical discomforts such as heart palpitations and chest pain. I was able, under this medication, to increase my level and length of concentration, even though I continued to have some anxiety as to whether I would be able to achieve my academic and Navy goals.

In May '88, my medication was terminated and I went on my first-class cruise. During the cruise, I again experienced pains similar to those I had experienced earlier in the year. I was very uncomfortable for most of the cruise period. Neither I, nor anyone else, realized that I was perhaps on the brink of a major depressive episode, as has now been finally diagnosed....

As the 1988 fall term began, I found myself still to be physically and emotionally exhausted. I remained deeply agitated over my "Airways Passage" disease and its effects on my mental and physical well-being. That condition placed me under a severe handicap and ineptitude to pass the mile and a half run requirements—particularly in the last laps, when my chest would tighten [sic] up and I would be forced to slow down....

Finally, as the record shows, I was interned in the hospital this past September.

Even though I was completely stunned over what had happened to me, I slowly began to realize that I had indeed suffered a major depressive episode—but, while it cannot be cured overnight, it can be resolved through proper medical treatment and therapy and may never occur again.

I have discovered that many of the poor physical and emotional feelings which I experienced culminated from the onset of my depressive episode. Since I have been at the Bethesda Naval Hospital Psychiatric Ward, I have learned to control my anxieties and to use relaxation methods at night to calm myself. I have also learned to put my desires and goals into better perspective in relation to my depressive experience. I believe that, with a little more time to allow the current program of medication to achieve its full effect, I will be able to recuperate fully. I will be able to build up my physical, mental and emotional stamina so that I can continue with my intended naval career. In order to accomplish this, I respectfully request that I be allowed to pursue one of the following three options, preserving my opportunity to graduate from the Naval Academy and receive a commission in the United States Navy.

Plaintiff's rebuttal then proceeded to outline three possible scenarios which would allow him to recuperate and return to the Academy. The first option, which was plaintiff's preferred option, would have plaintiff remain at home on convalescent leave from December 1988 through June 1989, then transition to the Naval Academy's class of 1990 on July 1, 1989.

Plaintiff's second option was similar to the first, except that his convalescent leave at home would extend for two months longer over the summer, and he would not undertake summer activities at the Naval Academy. He would then join the class of 1990 at the commencement of classes in the fall of 1989. He would carry a full academic load, with expected graduation in May, 1990. Plaintiff considered this option to be less advantageous since, under it, he would have to take a full course load in both the fall and spring semesters.

Plaintiff's third option would have him returning to the Naval Academy at the beginning of the second semester in January 1989, approximately three weeks after his discharge from the hospital. He stated that, "because [he] would still need to allot specific segments of time to continue the rebuilding of [his] physical and cognitive stamina, this option would have to permit an exception to the usual, average number of academic hours required to be carried during an academic semester." He then proposed six semester hours for that spring 1989 semester, six hours over the summer, and a full fifteen hour course load during the fall 1989 semester, to ensure his graduation with the honors degree in political science. This was plaintiff's least preferred option, since, despite providing him an opportunity for an earlier graduation and commissioning, it could be counterproductive because it might "force a return to tension-inducing environment too soon after [his] hospitalization and might not allow sufficient time for the prescribed pharmacological intervention and physical/cognitive rehabilitation to take full effect in the most suitable environment."

On February 9, 1989, the Superintendent of the Academy, Rear Admiral V.L. Hill, Jr., forwarded the Medical Board Report to the Secretary of the Secretary of the Navy via the Chief of Naval Personnel, with a statement "concurring with the recommendation of the Medical Board and Convening Authority that plaintiff be disenrolled from the Naval Academy and separated from the Naval [S]ervice." On March 9, 1989, the Office of the Chief of Naval Personnel forwarded the Medical Board Report to the Secretary of the Navy, stating, "[t]he Chief of Naval Personnel concurs with the Superintendent, U.S. Naval Academy and the Convening Authority that Midshipman Kenneth B. Golding be discharged from the U.S. Naval Academy and the Naval Service by reason of major depression, single episode, resolving, that did not exist prior to entry into the Naval Service."

On March 17, 1989, the Assistant Secretary of the Navy (Manpower and Reserve Affairs), Kenneth P. Bergquist, sent a letter to plaintiff, forwarded through the Chief of Naval Personnel and the Superintendent of the Naval Academy. The letter stated,

1. Reference (a) [the Medical Board Report] is notification of the medical determination that you have been found to be physically disqualified for the Naval Service by reason of a major depression, single episode, resolving, that did not exist prior to entry into the Naval Service. You are hereby discharged from the U.S. Naval Academy and honorably discharged from the Naval Service, by reason of physical disability to take effect upon completion of processing for separation.

On March 21, 1989, the Office of the Chief of Naval Personnel forwarded Mr. Bergquist's letter to the Superintendent of the Naval Academy, and on March 27, 1989, the Superintendent forwarded the letter to plaintiff. Plaintiff's honorable discharge was effective March 27, 1989.

On March 31, 1989, four days after the effective date of plaintiff's discharge, he submitted an application to the Veterans Administration (VA) for disability compensation. On June 19, 1989, plaintiff filled out a VA "Report of Medical Examination for Disability Evaluation." Plaintiff wrote: "1987: RML Pneumonia; 1987–Present: contracted into Reactive Airways Disease; 1988–Depressive Episode due to illness involved." He also stated, "[c]hronic state of anxiety, depression, from withdrawal of medication. Conventional Medication caused a number of side effects which has affected my thinking capability and my body's organs."

On June 15, 1989, plaintiff was seen for a Veterans Administration disability rating examination by Dr. Irfan Kucukcetin, M.D., a VA psychiatrist. Dr. Kucukcetin noted plaintiff was "very upset over the fact that conventional medication caused a number of side effects." Plaintiff described himself as "persistent, innovative, creative and a very relaxed person." Plaintiff told Dr. Kucukcetin that he thought his asthma was getting worse, and that he had a "neuro-transmitter problem." Dr. Kucukcetin stated plaintiff's "insight was minimal or poor to his condition." From the history and clinical findings, Dr. Kucukcetin diagnosed plaintiff with "Major depression—single episode, severe, with-

out psychotic features" and obsessive compulsive personality disorder.

A June 19, 1989, chest x-ray was normal, with no active cardiopulmonary findings. A pulmonary function test performed on July 13, 1989, showed plaintiff with reduced pulmonary capacity. On August 21, 1989, plaintiff was assigned a disability rating of ten percent. The effective date of the disability rating was April 1, 1989, and the monthly disability payment for plaintiff was set at $73.00.

On April 21, 1992, as part of a periodic re-evaluation of plaintiff's VA benefit, plaintiff's mother submitted a "Statement in Support of Claim" to the VA. In it, she stated, "[m]y son, Kenneth B. Golding, has been diagnosed with a Bipolar Disorder.[24] After being treated by [Lieutenant Commander] D. Auvil, M.D., for this condition, he is under the impression that my son could still suffer another episode which may warrant a return admission into the hospital." After a temporary termination of plaintiff's disability benefit through an agency administrative oversight, plaintiff was examined by Alex R. Kelly, M.D., on September 21, 1992. Dr. Kelly notes plaintiff's belief that he was "inadequately and inaccurately treated by the Navy," leading to plaintiff's discharge from the Naval Academy. From his discussion with the plaintiff, Dr. Kelly stated:

> It does appear that he had a reactive adjustment-type illness, perhaps correctly diagnosed as atypical depression while in the Navy, and his diagnosis will be continued, although the symptoms were not typical of depression and he does not appear depressed at the present time.

Dr. Kelly stated his diagnosis as "atypical depression, single episode; now in remission." Plaintiff's disability rating was continued at ten percent, and his monthly payment was now $83.00.

After leaving the Naval Academy, plaintiff attended the University of Virginia, graduating in 1992. Because of the University of Virginia's academic requirements, plaintiff was required to attend classes for two years

in order to receive his degree, completing seventy-two semester credit hours.

The December, 1989 *American Journal of Psychiatry* contained a letter to the editor titled, "Fluoxetine and Nortriptyline Combination Therapy." The letter was written by Drs. Hoyle, Clayton, and Schraml, and Mr. Benedetti. Drs. Hoyle and Schraml were two of the three members of the plaintiff's Medical Board, in addition to being involved in plaintiff's care. Dr. Clayton was the psychiatrist who examined plaintiff upon his admission to the hospital. The letter refers to the treatment of a "Mr. A." Defendant acknowledges that plaintiff is the "Mr. A" referred to in the letter to the editor. The letter indicates that its purpose is to report a case where there was a marked increase in the patient's serum level of nortriptyline following augmentation with fluoxetine (Prozac). The letter concluded that "[t]his case indicates the need for caution and frequent serum level monitoring when combining fluoxetine and other antidepressant medications." Plaintiff advises that he discovered the letter in December 1994, and subsequently filed the instant complaint.

## DISCUSSION

*Motion to Dismiss*

 The plaintiff has filed a motion for summary judgment and the defendant has filed a motion to dismiss the complaint for lack of subject matter jurisdiction and/or for failure to state a claim upon which relief can be granted pursuant to RCFC 12(b)(1) and 12(b)(4), respectively, as well as a motion for summary judgment discussed below. Subject matter jurisdiction may be challenged at any time by the parties, by the court *sua sponte*, or on appeal. *Booth v. United States*, 990 F.2d 617, 620 (Fed.Cir.1993), *reh'g denied* (1993); *United States v. Newport News Shipbuilding & Dry Dock Co.*, 933 F.2d 996, 998 n. 1 (Fed.Cir.1991). Once jurisdiction is challenged by the court or the opposing party, the plaintiff bears the burden of establishing jurisdiction. *See McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298

---

24. Bipolar Disorder—"pertaining to mood disorders in which both manic and depressive episodes occur." *Dorland's Illustrated Medical Dictionary* 201 (28th ed.1994).

U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Alaska v. United States,* 32 Fed.Cl. 689, 695 (1995), *appeal dismissed,* 86 F.3d 1178 (Fed.Cir.1996); *Catellus Dev. Corp. v. United States,* 31 Fed.Cl. 399, 404 (1994); *Rocovich v. United States,* 933 F.2d 991, 993 (Fed.Cir.1991). A plaintiff must establish jurisdiction by a preponderance of the evidence. *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 748 (Fed.Cir.1988); *Alaska v. United States,* 32 Fed.Cl. at 695. When construing the pleadings pursuant to a motion to dismiss, the court should grant the motion "only if 'it appears beyond doubt that plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief.'" *Son Broad. Inc. v. United States,* 42 Fed.Cl. 532, 537 (1998) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *see also Hamlet v. United States,* 873 F.2d 1414, 1416 (Fed.Cir.1989); *W.R. Cooper Gen. Contractor, Inc. v. United States,* 843 F.2d 1362, 1364 (Fed.Cir.1988) ("If the ... facts [alleged in the complaint] reveal any possible basis on which the nonmovant might prevail, the motion must be denied.").

Pursuant to RCFC 8(a)(1) and the Federal Rules of Civil Procedure 8(a)(1), a plaintiff need only state in the complaint "a short and plain statement of the grounds upon which the court's jurisdiction depends ...." However, "[d]etermination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." *Holley v. United States,* 124 F.3d 1462, 1465 (Fed.Cir.1997), *reh'g denied* (1997). "[C]onclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." *Briscoe v. LaHue,* 663 F.2d 713, 723 (7th Cir.1981), *aff'd,* 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983); *see also Bradley v. Chiron Corp.,* 136 F.3d 1317, 1322 (Fed.Cir.1998) ("Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim.").

When deciding on a motion to dismiss based on either lack of subject matter jurisdiction or failure to state a claim, this court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Conley v. Gibson,* 355 U.S. at 45–46, 78 S.Ct. 99; *accord Boyle v. United States,* 200 F.3d 1369, 1372 (Fed.Cir.2000); *see also Alaska v. United States,* 32 Fed.Cl. at 695; *Highland Falls–Fort Montgomery Cent. School Dist. v. United States,* 48 F.3d 1166, 1167 (Fed.Cir. 1995) (citing *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991)), *cert. denied,* 516 U.S. 820, 116 S.Ct. 80, 133 L.Ed.2d 38 (1995); *Henke v. United States,* 60 F.3d 795, 797 (Fed.Cir.1995); *Hamlet v. United States,* 873 F.2d at 1416. If a defendant or the court challenges jurisdiction or plaintiff's claim for relief, however, the plaintiff cannot rely merely on allegations in the complaint, but must instead bring forth relevant, competent proof to establish jurisdiction. *McNutt v. Gen. Motors Acceptance Corp. of Ind.,* 298 U.S. at 189, 56 S.Ct. 780; *see also Land v. Dollar,* 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947); *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d at 747; *Catellus Dev. Corp. v. United States,* 31 Fed.Cl. at 404–05. When considering a motion to dismiss, the court may examine relevant evidence in order to resolve any disputes as to the truth of the jurisdictional facts alleged in the complaint. *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d at 747; *see also Cedars–Sinai Med. Ctr. v. Watkins,* 11 F.3d 1573, 1584 (Fed.Cir.1993), *cert. denied sub nom. Cedars–Sinai Med. Ctr. v. O'Leary,* 512 U.S. 1235, 114 S.Ct. 2738, 129 L.Ed.2d 859 (1994) ("In establishing predicate jurisdictional facts, a court is not restricted to the face of the pleadings, but may review evidence extrinsic to the pleadings, including affidavits and deposition testimony.").

In order for this court to have jurisdiction over a plaintiff's complaint, the Tucker Act requires that the plaintiff identify an independent substantive right enforceable against the United States for money damages. 28 U.S.C. § 1491 (1994 & Supp. II 1998). The Tucker Act states:

The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the Unit-

ed States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). As interpreted by the United States Supreme Court, this Act waives sovereign immunity to allow jurisdiction over claims (1) founded on an express or implied contract with the United States; (2) for a refund from a prior payment made to the government; or (3) based on federal constitutional, or statutory, or regulatory law mandating compensation by the federal government for damages sustained. *See United States v. Testan,* 424 U.S. 392, 400, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976), *reh'g denied,* 425 U.S. 957, 96 S.Ct. 1736, 48 L.Ed.2d 202 (1976) (citing *Eastport Steamship Corp. v. United States,* 178 Ct.Cl. 599, 605–06, 372 F.2d 1002, 1009 (1967)); *see also Palmer v. United States,* 168 F.3d 1310, 1314 (Fed.Cir. 1999); *Stinson, Lyons & Bustamante, P.A. v. United States,* 33 Fed.Cl. 474, 478 (1995), *aff'd,* 79 F.3d 136 (Fed.Cir.1996). A waiver of traditional sovereign immunity " 'cannot be implied but must be unequivocally expressed.' " *Saraco v. United States,* 61 F.3d 863, 864 (Fed.Cir.1995) (quoting *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969)), *cert. denied,* 517 U.S. 1166, 116 S.Ct. 1565, 134 L.Ed.2d 665 (1996).

The Tucker Act, however, merely confers jurisdiction on the United States Court of Federal Claims, " 'it does not create any substantive right enforceable against the United States for money damages.' " *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (quoting *United States v. Testan,* 424 U.S. at 398–99, 96 S.Ct. 948), *reh'g denied,* 446 U.S. 992, 100 S.Ct. 2979, 64 L.Ed.2d 849 (1980); *United States v. Connolly,* 716 F.2d 882, 885 (Fed.Cir.1983) (en banc), *cert. denied,* 465 U.S. 1065, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984). Individual claimants, therefore, must look beyond the jurisdictional statute for a waiver of sovereign immunity. *United States v. Mitchell,* 445 U.S. at 538, 100 S.Ct. 1349. "[I]n order for a claim against the United States founded on statute or regulation to be successful, the provisions relied upon must contain language which could fairly be interpreted as mandating recovery of compensation from the government." *Cummings v. United States,* 17 Cl.Ct. 475, 479 (1989), *aff'd,* 904 F.2d 45 (Fed.Cir.1990) (table) (citations omitted); *see also United States v. Mitchell,* 463 U.S. 206, 216–17, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (quoting *United States v. Testan,* 424 U.S. at 400, 96 S.Ct. 948 (quoting *Eastport Steamship Corp. v. United States,* 178 Ct.Cl. at 607, 372 F.2d at 1009)); *Tippett v. United States,* 185 F.3d 1250, 1254 (Fed.Cir.1999) ("[T]he plaintiff must assert a claim under a separate money-mandating constitutional provision, statute, or regulation, the violation of which supports a claim for damages against the United States.") (quoting *James v. Caldera,* 159 F.3d 573, 580 (Fed.Cir.1998), *reh'g denied* (1999)); *John Doe v. United States,* 100 F.3d 1576, 1579 (Fed.Cir.1996), *reh'g denied* (1997); *Moyer v. United States,* 190 F.3d 1314, 1318 (Fed.Cir.1999) ("Under the Tucker Act, when a cause of action is not based upon breach of contract against the government, the Court of Federal Claims has jurisdiction only over those constitutional provisions, statutes, or regulations that by their terms entitle a plaintiff to money.").

Plaintiff's complaint states that he was wrongfully discharged from the Naval Academy and the Naval Service. Plaintiff does not cite a pay mandating statute, however, 37 U.S.C. § 203(c) (1988), cited by the defendant in its briefing papers, entitled plaintiff to receive monthly cadet pay until properly separated. If plaintiff's discharge was improper, he would have been entitled to the pay and allowances he would have received as a midshipman until he was offered a commission, accepted it, and was commissioned as an officer in the Naval Service. *See Sawyer v. United States,* 930 F.2d 1577, 1580 (Fed.Cir.1991).

Plaintiff further asks that he be awarded a diploma from the Naval Academy; that his discharge be voided and that he be restored to duty; that he receive back pay and allowances for the time period from his discharge from the Navy to the present; in order to be " 'made whole' for the deprivations he has suffered." Plaintiff asserts an entitlement to

pay, post-Naval Academy, by commissioned Naval officers under the authority of the military pay statute, 37 U.S.C. § 204(a)(1) (1988), and to ancillary relief under the Tucker Act.

### Term of Service

Plaintiff argues that it was his intention to make a career in the Navy, and not merely to study at the Naval Academy for a four-year term of service. Plaintiff's position is that he was an officer with an indefinite term of service, and "should be found to be a constructive member of the military service until such time as he is legally separated from the service, which has yet to happen." Plaintiff relies on *Groves v. United States*, 47 F.3d 1140 (Fed.Cir.), *reh'g denied* (1995), for support. The court, however, finds *Groves* distinguishable from the present case.

Major Groves was an Army officer on active duty when he was court-martialed, convicted for filing false travel claims requesting reimbursement in the amount of $443.40, confined for three months, then relieved from active duty pending appellate review of his conviction. During his confinement he remained a commissioned officer in the Army Reserves under an appointment for an indefinite term on active duty. *Groves v. United States*, 47 F.3d at 1142–43. His conviction was subsequently overturned on appeal, with the appellate court directing that "[a]ll rights, privileges and property of which the accused has been deprived by virtue of the findings of guilty and sentence so set aside will be restored." *Id.* at 1143. This language had a statutory origin. *Id.* at 1143 (citing 10 U.S.C. § 875(a)). The United States Court of Appeals for the Federal Circuit determined that Major Groves' backpay did not end upon his discharge. Major Groves was improperly discharged on January 22, 1991, but was not ordered to report for duty until February 15, 1992. Major Groves refused to report for duty despite being ordered to do so on the latter date. *Id.* at 1146. The Federal Circuit determined that Major Groves was entitled to backpay beyond the defective discharge, until the point that he was ordered to return to duty, but refused to do so.

Plaintiff states that he "was like the litigant in *Groves v. United States*, ..., who was an officer on active duty for an indefinite term of service. *Id.* at 1143," so that backpay may be awarded, beyond a defective discharge. Had plaintiff been a commissioned officer, *Groves* might have applied. However, questions regarding the interrupted service of a midshipman at the Naval Academy by reason of physical disability are not resolved by the decision in *Groves*. Rather than the specialized statutory and regulatory scheme at issue in *Groves*, the Naval Academy is governed by its own specialized mechanism, discussed below.

Plaintiff argues that, under the governing statutes and agreements, a midshipmen serves until lawfully discharged from the military or the midshipman resigns and the resignation is accepted. Plaintiff took the oath of office as a midshipman at the Naval Academy on July 2, 1985, and was discharged for physical disqualification less than four years later, on March 27, 1989. The course of study at the Naval Academy is statutorily defined as four years. 10 U.S.C. § 6966 (1988). Plaintiff signed an "Agreement to Serve and Degree Requirements," prior to taking the oath of office as a midshipman. Plaintiff's agreement provided that, "[i]n accordance with Title 10, U.S.Code Section 6959(a)," "unless sooner separated from the [N]aval [S]ervice," he would "[c]omplete the course of instruction at the Naval Academy (which includes satisfactorily achieving the required standards of performance ... until the time of appointment as a commissioned officer)." Plaintiff also agreed to "[a]ccept a commission ... if it is proffered." The language of the agreement is consistent with 10 U.S.C. § 6959, which is cited in the agreement. The statute provides that a midshipman "will complete the course of instruction at the Naval Academy," and upon graduation, "will accept an appointment, if tendered, as a commissioned officer ...." 10 U.S.C. § 6959(a)(1), (2)(A) (1988).

The agreement and statutory provisions demonstrate that plaintiff's situation is not analogous to that of Major Groves. Plaintiff's situation is more analogous to enlisted members of the armed forces, whose entitle-

ment to backpay ends with their specified terms of enlistment. *See Maier v. Orr,* 754 F.2d 973, 983 (Fed.Cir.), *reh'g denied,* 758 F.2d 1578 (Fed.Cir.1985); *Hawley v. United States,* 12 Cl.Ct. 563, 567 (1987); *McEniry v. United States,* 7 Cl.Ct. 622, 626, *aff'd,* 785 F.2d 323 (Fed.Cir.1985) (table). Plaintiff's situation also is more analogous to the Army Reserve Officer Training Corps (ROTC) cadet in *Martinez v. United States* who was disenrolled from the senior ROTC program's advanced course due to drug abuse. *Martinez v. United States,* 26 Cl.Ct. 1471 (1992), *aff'd,* 11 F.3d 1069 (Fed.Cir.1993) (table). A formal Board of Officers recommended disenrollment, and the Army Board for Correction of Military Records denied relief to the cadet. *Id.* at 1477. The court concluded that:

> At the time of his separation from the military, Martinez was a Senior ROTC cadet receiving a monthly stipend. His status as a ROTC cadet would have ended when he graduated and received his commission: ten days after his disenrollment.
>
> The United States undertook to pay Martinez until his current ROTC assignment ended, unless the Army properly discharged him prior to that time. *See Austin v. United States,* 206 Ct.Cl. 719, 723, *cert. denied,* 423 U.S. 911, 96 S.Ct. 215, 46 L.Ed.2d 140 (1975). The alleged unlawful separation interrupted a continuing obligation between Martinez and the United States. Thus, this court has jurisdiction to review Martinez's alleged unlawful separation action based on his premature disenrollment from ROTC.
>
> This court cannot, however, base any relief on Martinez's expectation of a commission as a second lieutenant, which was within the Army's discretion to either grant or deny. *Wright v. United States,* 209 Ct.Cl. 734, 734–35, 538 F.2d 347 (1976); *see also [United States v.] Testan,* 424 U.S. [392,] 402, 96 S.Ct. [948,] 955, 47 L.Ed.2d 114 [(1976)] (stating that "[t]he established rule is that one is not entitled to the benefit of a position until he has been duly appointed to it").

*Martinez v. United States,* 26 Cl.Ct. at 1474. *See also Orloff v. Willoughby,* 345 U.S. 83, 90, 73 S.Ct. 534 ("It is obvious that *the commissioning of officers* in the Army is a *matter of discretion* within the province of the President as Commander in Chief. Whatever control courts have exerted over tenure or compensation under an appointment, *they have never assumed by any process to control the appointing power either in civilian or military positions.*" (emphasis in original)), *reh'g denied,* 345 U.S. 931, 73 S.Ct. 779, 97 L.Ed. 1360 (1953); *Rice v. United States,* 31 Fed.Cl. 156, 162–63 (1994), *aff'd,* 48 F.3d 1236 (Fed.Cir.1995) (table). Plaintiff has not convinced the court that *Groves* controls, in light of the circumstances of that case, compared to the language of plaintiff's agreement with the Naval Academy and of 10 U.S.C. § 6959. The term of service of midshipmen is not indefinite, but contingent upon achievement of all standards of performance, satisfactory completion of the course of instruction, and proffer and acceptance of a commission. Major Groves had been offered and had accepted a commission, unlike plaintiff. If plaintiff is able to demonstrate a defective discharge for the purposes of back pay, it would take him to the end of a midshipman's term of service, and no further.

Defendant argues that plaintiff is not entitled even to the backpay between the date of his discharge and the date he would have graduated from the Naval Academy. Citing *Graves v. United States,* 176 Ct.Cl. 68, 70, 74, 1966 WL 8807 (1966), defendant asserts that the plaintiff, due to physical disability, was not "ready, willing, and able" to resume his position as a midshipman, and asks that the request for backpay for this period be dismissed. The court notes, however, that Mr. Graves was not a midshipman or even a service member, but a GS–12 civil servant, who separated from the civil service due to a reduction in force. *Id.* at 74. Plaintiff argues that he was "convalescing until such time as he recuperated and was able to resume his duties," and notes that he was paid during the time that he was an inpatient at the Bethesda Naval Hospital, and also during the period that he was convalescing at home, up to the point he was discharged. Plaintiff's argument is that, if his "involuntary discharge was improper, his statutory right to

pay was not extinguished." This court does not accept defendant's contention that plaintiff, who, like the plaintiff in *Graves*, was on sick leave, was not ready, willing, and able to report for duty up until the time of plaintiff Golding's discharge. The court, therefore, turns to a determination of whether or not Mr. Golding was improperly discharged from the Naval Academy and the Naval Service.

*Dismissal in the Best Interest of the Service*

■ Plaintiff alleges in count two of his complaint that 10 U.S.C. § 6961 (1988) (titled "Midshipmen: dismissal for the best interests of the service") and Secretary of the Navy Instruction (SECNAVINST) 1531.1A, dated March 13, 1989, which implements the statute, required the personal approval of the President of the United States before plaintiff could be discharged. Instead, plaintiff's discharge was effected by a letter from the Assistant Secretary of the Navy for Manpower, Reserve Affairs, and Logistics. Section 6961 provides that:

(a) Whenever the Superintendent of the Naval Academy believes that the continued presence of any midshipman at the Academy is contrary to the best interest of the service, he shall report in writing to the Secretary of the Navy a full statement of the facts upon which his belief is based. If the Secretary determines from the report that the Superintendent's belief is well founded, the Secretary shall serve a copy of the report on the midshipman. Within such time as the Secretary considers reasonable, the midshipman shall show cause in writing why he should not be dismissed from the Academy. The Secretary, after consideration of any cause so shown, and with the written approval of the President, may dismiss the midshipman from the Academy and from the naval service.

(b) The truth of any issue of fact raised under subsection (a), except as to the record of demerits, shall be determined by a court of inquiry convened by the Secretary.

10 U.S.C. § 6961 (1988). Plaintiff contends that the Superintendent did not provide the Secretary of the Navy with the required written report, the Secretary of the Navy did not provide the plaintiff with an opportunity to show cause why he should not be dismissed, and the President never approved plaintiff's dismissal.

Defendant responds that it did not, in fact, rely on 10 U.S.C. § 6961 as the basis for plaintiff's discharge. Defendant cites as an example of a proper section 6961 discharge the case of *Dougherty v. Lehman*, 688 F.2d 158 (3d Cir.1982). In that case, however, Midshipman Dougherty was discharged from the Naval Academy for sexual misconduct pursuant to 10 U.S.C. § 6962 (1988) (titled "Midshipmen: discharge for unsatisfactory conduct or inaptitude"), not section 6961. *Id.* at 159–61. Defendant cites *Wimmer v. Lehman*, 705 F.2d 1402 (4th Cir.), *cert. denied*, 464 U.S. 992, 104 S.Ct. 484, 78 L.Ed.2d 681 (1983), as another example of a section 6961 case; however, Midshipman Wimmer was discharged from the Naval Academy for possession and use of marijuana, also pursuant to 10 U.S.C. § 6962, not section 6961. *Id.* at 1403. Nor has the plaintiff identified any reported cases of midshipmen discharged from the Naval Academy for physical disqualification pursuant to 10 U.S.C. § 6961, the statute plaintiff contends is applicable.

Section 6961, though broadly titled ("best interest of the service"), does not state that it is required to be used for physical disqualification cases. The United States Code reflects that changes were made to section 1961 in 1956: "The words 'court of inquiry' are substituted for the words 'board of inquiry' to conform to the terminology of the Uniform Code of Military Justice." 10 U.S.C. § 6961 (Historical and Revision Notes) (1988).[25] As noted above, this 1956 change is reflected in the language of 10 U.S.C. § 6961(b): "The truth of any issue of fact raised under subsection (a) ... shall be determined by a court of inquiry convened by

---

**25.** "Courts of inquiry" may be convened by the general court-martial convening authority to investigate any matters. 10 U.S.C. § 935 (1988) (Uniform Code of Military Justice, Article 135). The record of proceedings of a court of inquiry,

reflecting the testimony of a person whose oral testimony is not available, may be admissible in a court-martial. 10 U.S.C. § 850 (1988) (Uniform Code of Military Justice, Article 50).

the Secretary." 10 U.S.C. § 6961(b). This reference in the United States Code to the Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 801–940 (1988), the military's criminal code, suggests that section 6961 potentially involves dismissal from the Naval Academy for UCMJ offenses, and not disenrollment for physical disqualification, which is not involved with the UCMJ. Furthermore, the reference in 10 U.S.C. § 6961(b) to "demerits," suggests that section 6961 is intended for cases involving other than physical disqualification. No cases involving discharge under section 6961, either physical disqualification cases, or other types of cases have been identified.

Defendant argues that plaintiff was discharged "solely because he was physically disqualified to be retained." Defendant cites to the Manual of the Medical Department, U.S. Navy, which states: "A periodic and precommissioning physical examination of Naval Academy midshipmen must be conducted following regulations governing the Naval Academy and at such time as may be determined by the Superintendent." [26] Defendant notes that the Manual of the Medical Department, dated July 2, 1987, requires the referral of a case to a Medical Board when:

> 18–11(2)(d) Continued military service would probably result in an inordinate amount of hospitalization or other close medical supervision; or would be likely to aggravate the existing condition.
>
> \* \* \* \* \* \*
>
> 18–11(2)(g) In the opinion of the cognizant medical officer a service member has suffered from a significant illness or injury which may impact on future service, even though the member may now appear to be fit for full duty.
>
> \* \* \* \* \* \*
>
> 18–12(2) When an officer candidate or midshipman has been undergoing treatment for any impairment which is likely to be recurrent or progressive or to become incapacitating either prior or subsequent to appointment, the officer candidate or

midshipman will be ordered before a medical board before being returned to duty. The physical fitness of such members is to be evaluated in regard to probable ability to perform duty in commissioned grade rather than to continue in training. In such instances, final determination of the member's physical fitness for appointment to commissioned grade shall be held in abeyance pending Departmental action on the board's report.

The Manual of the Medical Department indicates that Medical Boards "serve to report upon the present state of health of any member of the Armed Forces and as an administrative board by which the convening authority or higher authority obtains a considered clinical opinion regarding the physical status of service personnel."

Pursuant to the Naval Military Personnel Manual, dated January 11, 1989, disenrollment of midshipmen from the Naval Academy and separation from the Naval Service was authorized by letter from the Secretary of the Navy due to physical disqualification for military service:

**3640415 DISPOSITION OF MIDSHIPMEN DISENROLLED FROM THE NAVAL ACADEMY**

> \* \* \* \* \* \*
>
> 6. Disenrollment from the Naval Academy is authorized by letter from the Secretary of the Navy directing disposition in accordance with the following: ... b. Discharge from the naval service provided the midshipman is determined to be in one of the following categories: ... (2) Is disenrolled from the Naval Academy because of ... physical disqualification for military service.... In each case of this nature, the individual letter from the Secretary of the Navy authorizing disenrollment from the Naval Academy will direct separation from the naval service as well.

The record reflects that on February 9, 1989, the Superintendent of the Naval Academy, Rear Admiral V.L. Hill, Jr. forwarded plaintiff's Medical Board Report to the Sec-

---

**26.** After reviewing the record, the court requested the parties to provide copies of the applicable Navy Medical Manual, the Navy Personnel Manual, and the Medical Policy for Not Physically Qualified Naval Midshipmen instead of the very limited references provided in the briefs.

retary of the Navy, through the Chief of Naval Personnel, "concurring with the recommendations of the Medical Board and Convening Authority that Midshipman Golding be disenrolled from the Naval Academy and separated from the Naval [S]ervice." On March 9, 1989, the Medical Board Report was forwarded, by direction of the Chief of Naval Personnel, to the Secretary of the Navy, concurring that plaintiff be discharged from the Naval Academy and the Naval Service. On March 17, 1989, the Assistant Secretary of the Navy (Manpower and Reserve Affairs), Kenneth P. Bergquist, in a letter "From: Secretary of the Navy," to plaintiff, through the Chief of Naval Personnel, stated that: "You are hereby discharged from the U.S. Naval Academy and honorably discharged from the Naval Service, by reason of physical disability to take effect upon completion of processing for separation."

Statutory language at 10 U.S.C. § 5013 (titled "Secretary of the Navy") provides that the Secretary is responsible for all affairs of the Navy, including recruiting and training, 10 U.S.C. § (b)(1) and (b)(5), and that the Secretary "may assign such of his functions, powers, and duties as he considers appropriate to the ... Assistant Secretaries of the Navy...." 10 U.S.C. § 5013(f) (1988). Pursuant to 10 U.S.C. § 5014(b)(2) (1988), the Office of the Secretary of the Navy includes the Assistant Secretaries of the Navy. Regulations at 32 C.F.R. § 700.203 describing the organization of the Navy under the direction of the Secretary of the Navy, provide that:

> (a) The Civilian Executive Assistants to the Secretary of the Navy [include] ... the Assistant Secretaries of the Navy.... It is the policy of the Secretary to assign Department-wide responsibilities essential to the efficient administration of the Department of the Navy to and among his Civilian Executive Assistants.
>
> (b) The Civilian Executive Assistants, within their respective areas of responsibility, are the principal advisers and assistants to the Secretary on the administration of the affairs of the Department of the Navy.... The Civilian Executive Assistants are authorized and directed to act for the Secretary within their assigned areas of responsibility.
>
> \* \* \* \* \* \*
>
> (e) The Assistant Secretary of the Navy (Manpower, Reserve Affairs and Logistics) is responsible for the overall supervision of manpower and reserve component affairs of the Department of the Navy, including policy and administration of affairs related to military (active and inactive) and civilian personnel ....

32 C.F.R. § 700.203(a), (b), (e) (1988). The court concludes that the Secretary of the Navy was authorized, by Navy regulations, to discharge plaintiff for physical disqualification, and that the Assistant Secretary of the Navy for Manpower, in turn, was authorized to act for the Secretary in this regard. Count two of the complaint, which alleges a violation of 10 U.S.C. § 6961 and the Navy instruction which implements 10 U.S.C. § 6961, is inapplicable to this case, and is dismissed on the pleadings, for failure to state a claim upon which relief can be granted.[27]

---

**27.** Defendant argues, in the alternative, that even if 10 U.S.C. § 6961 applied to this case, the Navy properly discharged plaintiff. Section 6961 provides for the dismissal of midshipmen only with the written approval of the President. In this regard, the United States Code also provides, at 10 U.S.C. § 6961, as follows: "For delegation to the Secretary of Defense of authority vested in the President by section 1062 of former Title 34 [the source of section 6961], see Ex. Ord. No. 10621, July 1, 1955, 20 F.R. 4759, set out as a note under section 301 of Title 3, The President." 10 U.S.C. § 6961 (1988) ("Delegation of Functions"). The cited Executive Order 10621 delegates the President's discharge authority under 10 U.S.C. § 6961 to the Secretary of Defense, with no restrictions on redelegation. Exec. Order No. 10,621, 20 F.R. 4759 (July 1, 1955), reprinted as amended in 3 U.S.C. § 301 app. (1994). In turn, Department of Defense Directive 1332.23, dated Feb. 19, 1988, and titled "Service Academy Disenrollment," provides for the separation of physically disqualified service academy cadets and midshipmen, and directs the Secretaries of the Military Departments to comply with the Department of Defense directive. Implementing the Department of Defense Directive, Secretary of the Navy Instruction (SECNAVINST) 1531.1A, dated March 13, 1989, and titled "U.S. NAVAL ACADEMY MIDSHIPMEN DISENROLLMENT," similarly provides for the separation of physically disqualified midshipmen. Thus, section 6961 discharge authority appears to have been delegated to the Navy, as suggested

*The Equal Employment Opportunity (EEO) Program*

■ Plaintiff alleges in count five of the complaint that his discharge violated the Department of Defense Equal Employment Opportunity (EEO) Program, citing 32 C.F.R. Part 51 (1988). Part 51 is titled "Education and Training in Human/Race Relations for Military Personnel," and "[e]stablishes the policies and assigns responsibilities for developing an active DoD program of education and training in human/race relations and equal opportunity." 32 C.F.R. § 51.1(c). Plaintiff does not cite specific provisions of this regulation, or case citations, and does not specify how this EEO training program within the Department of Defense provides plaintiff with a potential remedy in the Court of Federal Claims.

■ Part 51 does not address remedial action, but an EEO training program. Although plaintiff argues a violation of the "Equal Employment Opportunity Program," plaintiff does not cite, for example, to Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e–16 (1994). Title VII prohibits the federal government from acts of discrimination. Nor does Title VII apply to military personnel.[28] *See Canonica v. United States,* 41 Fed.Cl. 516, 522–23 (1998) (Title VII does not apply to military personnel, citing *Roper v. Department of Army,* 832 F.2d 247, 247–48 (2d Cir.1987) and *Gonzalez v. Department of the Army,* 718 F.2d 926, 927–29 (9th Cir.1983)); *Hodge v. Dalton,* 107 F.3d 705, 707–08, 712 (9th Cir.) (Equal Employment Opportunity Commission regulations, at 29 C.F.R. § 1614.103(d)(1), interpret Title VII as not applying to complaints of discrimination by military members), *cert. denied,* 522 U.S. 815, 118 S.Ct. 62, 139 L.Ed.2d 25 (1997). As stated by the Supreme Court, "[t]he special

status of the military has required, the Constitution contemplated, Congress has created and this Court has long recognized two systems of justice, to some extent parallel: one for civilians and one for military personnel." *Chappell v. Wallace,* 462 U.S. 296, 303–04, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983) (citing *Burns v. Wilson,* 346 U.S. 137, 140, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953)).

Furthermore, even if Title VII did apply to military personnel, jurisdiction for such claims lies in federal district court, not in the Court of Federal Claims. 42 U.S.C. §§ 2000e–5(f)(3), 2000e–16(c) (1994). *See Brown v. General Services Administration,* 425 U.S. 820, 825, 832, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976) (Title VII provides for a civil action in federal district court); *Mitchell v. United States,* 44 Fed.Cl. 437, 439 (1999) (judicial review of a federal employee's Title VII claim is in federal district court, and not in the United States Court of Federal Claims); *Canonica v. United States,* 41 Fed. Cl. at 523 (Title VII jurisdiction rests exclusively with federal district courts). Had plaintiff based his claim on Title VII, the count would have been dismissed for lack of jurisdiction. However, plaintiff pled, and failed to demonstrate a basis for recovery, under the military's EEO Education and Training Program. Therefore, count five of the complaint is dismissed for failure to state a claim upon which relief can be granted.

*The Rehabilitation Act*

■ In count four of the complaint, the plaintiff alleges a violation by the Navy of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1988), as amended, for failure to reasonably accommodate plaintiff's disability and permit the plaintiff to continue his studies at the Naval Academy. The Department of Defense has published regulations implementing the Rehabilitation Act, at 32 C.F.R. Part

by the defendant. Section 6961 also provides for a written report providing the basis for the discharge, and an opportunity for a midshipman to show cause why he should not be dismissed from the Naval Academy. Both of these elements are present in this case, with the Medical Board Report and plaintiff's rebuttal serving these functions. Therefore, even if section 6961 applied to this case, it would be satisfied under the facts of this case. As noted above, however, section 6961

did not provide the basis for plaintiff's disenrollment for physical disqualification.

28. *See Miller v. United States,* 42 F.3d 297, 301 (5th Cir.1995) ("[A] cadet in the Military or Naval academies has always been considered to be a member of the military forces of the United States . . . .") (quoting *Travis v. United States,* 137 Ct.Cl. 148, 152, 146 F.Supp. 847, 850 (1956)).

56 (1988). The purpose of the regulations was to prohibit discrimination, based on handicap, in programs and activities conducted by the Department of Defense. In a 1985 case, the United States Court of Appeals for the Eleventh Circuit observed that 32 C.F.R. § 56.7 contained "an extensive and exhaustive list of Department of Defense activities subject to the Rehabilitation Act. This list, however, omits mention of any program related to the procurement of military personnel." *Smith v. Christian,* 763 F.2d 1322, 1325 (11th Cir.1985). The United States Court of Appeals for the Sixth Circuit, in *Coffman v. Michigan,* agreed with the Eleventh Circuit that the rationale of courts refusing to extend the protections afforded to civilian members of military departments under Title VII to uniformed members of the armed forces was equally applicable to the Rehabilitation Act, and that "claims under the Rehabilitation Act may not be asserted by uniformed members of the armed forces." *Coffman v. Michigan,* 120 F.3d 57, 59 (6th Cir.1997) (citing *Doe v. Garrett,* 903 F.2d 1455, 1458–62 (11th Cir.1990), *cert. denied,* 499 U.S. 904, 111 S.Ct. 1102, 113 L.Ed.2d 213 (1991)). *See also Leistiko v. Stone,* 134 F.3d 817, 820–21 (6th Cir.), *reh'g denied* (1998).

Plaintiff, in response, argues that this military exception to the applicability of the Rehabilitation Act does not apply to midshipmen at the Naval Academy, citing a United States Supreme Court decision. Plaintiff argues that:

> In *Lane v. Pena,* 518 U.S. 187, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996), the Department of Transportation was held to be required to accommodate and reinstate a midshipman at the Merchant Marine Academy who suffered from diabetes. The Secretary of Transportation argued that because Midshipman Lane had diabetes, it was required that he be dismissed from the Academy because he would not meet commissioning standards of the Department of Defense. The Court rejected the Academy's argument, finding that although Lane suffered from diabetes, the law required that his condition should reasonably be accommodated by the Merchant Marine Academy. Similarly, here, plaintiff's medical condition should reasonably have been

accommodated but it was not. Plaintiff's condition could easily have been accommodated by allowing plaintiff to subsist at home or elsewhere until he had recuperated, and then allowing him to return to the U.S. Naval Academy, graduate, and be commissioned.

> This Court should therefore find that the Rehabilitation Act of 1973 applies to plaintiff, and that the act was violated.

A closer reading of *Lane v. Pena,* however, reveals that the case does not support plaintiff's position. The Academy at issue in *Lane v. Pena* was the Merchant Marine Academy, which is organized under the Maritime Administration, within the United States Department of Transportation. The Merchant Marine Academy trains cadets to serve as commercial merchant marine officers, and also as commissioned officers in the armed forces. *Lane v. Pena,* 867 F.Supp. 1050, 1054 (D.D.C.1994). Cadets at the Merchant Marine Academy agreed to serve as merchant marine officers, as employees of the United States maritime industry, or as commissioned officers on active duty in the armed forces, and also to apply for appointment as commissioned officers in the Naval Reserve, the Merchant Marine Reserve, the Coast Guard Reserve, or any armed forces reserve unit. *Id.* at 1057. Although diabetes was physically disqualifying for the Navy, the United States Coast Guard granted merchant marine licenses to persons, like James Lane, who qualified for a waiver by demonstrating that his diabetes was under control. *Id.* at 1055, 1056, 1067.

The federal district court in *Lane v. Pena* determined that, under the plain language of the Maritime Education and Training Act of 1980, 46 U.S.C.App. § 1295 (1988), cadets were required to qualify for a license as an officer in the merchant marine, and also to apply for, and, if tendered, accept, a commission in the armed forces reserve. *Id.* at 1060. The federal district court distinguished the Naval Academy from the Merchant Marine Academy: "[I]t is undisputed that the Annapolis Academy and West Point serve only a military purpose. In contrast, Congress charged the [Merchant Marine

Academy] with a dual purpose and, accordingly, gave cadets a choice of where to serve their active duty after graduation." *Id.* at 1062. The federal district court concluded that cadets must qualify for merchant marine licenses, but not necessarily for a commission in the armed forces. *Id.* at 1066. "[T]he Court finds that meeting physical requirements for commissioning in the naval reserve is not an essential program requirement." *Id.* at 1072. In the case before this court, plaintiff faced the physical qualification requirements of the Navy, not of the Merchant Marine, and is covered by the military exception to the applicability of the Rehabilitation Act, which this court adopts.

The federal district court not only ordered James Lane readmitted to the Merchant Marine Academy, but also awarded compensatory damages for the violation of the Rehabilitation Act. Before the United States Supreme Court, however, the government argued that the United States was protected against a damages claim by sovereign immunity. *Lane v. Pena,* 518 U.S. 187, 190, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996). The government's view prevailed. The Supreme Court restated settled principles for the waiver of sovereign immunity:

> A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text, and will not be implied. Moreover, a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign.... A statute's legislative history cannot supply a waiver that does not appear clearly in any statutory text; "the 'unequivocal expression' of elimination of sovereign immunity that we insist upon is an expression in statutory text." [*United States v. Nordic Village, Inc.,* 503 U.S. 30, 37, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992) ].

*Lane v. Pena,* 518 U.S. at 192, 116 S.Ct. 2092 (citations omitted). The Rehabilitation Act does not explicitly waive the government's immunity from monetary damages. *Id.* at 196, 116 S.Ct. 2092. The Supreme Court analogized the Rehabilitation Act to the Administrative Procedure Act, the latter providing for " '[a]n action in a court of the

United States seeking relief *other than money damages* ....' " *Id.* (citing 5 U.S.C. § 702 (emphasis in original)). For claims founded on a statute to be successful in the United States Court of Federal Claims, the provisions relied upon must contain language which "can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained." *United States v. Testan,* 424 U.S. 392, 400, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976) (quoting *Eastport Steamship Corp. v. United States,* 178 Ct.Cl. 599, 607, 372 F.2d 1002, 1009 (1967)). The Supreme Court in *Lane v. Pena* has instructed that the Rehabilitation Act is not a money-mandating statute. If plaintiff were relying exclusively on the Rehabilitation Act for the requisite money-mandating statute to proceed in this court, the case would be dismissed. Since other money-mandating statutes were identified earlier, the Rehabilitation Act is not needed to serve that function.

Moreover, as discussed above regarding Title VII EEO claims, claims under the Rehabilitation Act are required by statute to be brought in federal district court. *See* 29 U.S.C. § 794a(a)(1) (1994) (incorporating the remedies, procedures, and rights set forth in the Civil Rights Act of 1964, specifically including 42 U.S.C. §§ 2000e–5(f)(3) and 2000e–16(c)); *Mitchell v. United States,* 44 Fed.Cl. 437, 439 (1999) (citing *Hadley v. Dept. of the Navy,* 229 Ct.Cl. 591, 1981 WL 22067, at *2 (1981) (the United States Court of Claims is without jurisdiction to review Rehabilitation Act claims)). Therefore, count four of the complaint, alleging a violation of the Rehabilitation Act, is dismissed for lack of jurisdiction in the United States Court of Federal Claims. Alternatively, count four also is dismissed for failure to state a claim upon which relief can be granted, since the Rehabilitation Act, as noted above, is not applicable to military personnel.

*Due Process*

■■■ Count III of the plaintiff's complaint alleges that

> The actions of the defendant complained of above violated Title 10, U.S.Code Section 1201, *et seq.,* entitled "Retirement or Separation for Physical Disability" and Department of Defense and U.S. Navy di-

rectives, rules, and regulations, which provide, *inter alia,* that members on active duty in the military service are entitled to a formal hearing to determine discharge, separation, or retirement on the basis of Physical Disability, with the right to counsel and a right to be heard, and a determination made by a Physical Disability Evaluation Board (PEB) and other officials on the extent and degree of any disability, the extent to which any disability interferes with active duty military service, and whether any disability is temporary or permanent.

Although a violation of 10 U.S.C. § 1201, *et seq.* (1988) is alleged, plaintiff also acknowledged, in both Count VI of the complaint and in his brief accompanying his motion for summary judgment, that the same cited statutory program for "Retirement or Separation for Physical Disability" in Title 10, contains, at section 1217, the following pertinent exception: "This chapter does not apply to cadets at the United States Military Academy, the United States Air Force Academy, or the Coast Guard Academy, or to midshipmen of the Navy." 10 U.S.C. § 1217 (1988). Acknowledging this exception, plaintiff's position is that the Retirement or Separation for Physical Disability provisions of Title 10 should apply to midshipmen, such as himself, and that the statutory exclusion found at section 1217 for service academy cadets is unconstitutional.

The Federal Circuit has stated that this court does not possess jurisdiction over the particular type of type of constitutional claim plaintiff alleges if standing alone. In *Le-Blanc v. United States,* for example, the Federal Circuit addressed jurisdiction:

> First, the constitutional claims. His complaint included counts alleging violation of his rights under the Due Process Clauses of the Fifth and Fourteenth Amendments, the Equal Protection Clause of the Fourteenth Amendment, and the doctrine of separation of powers. None of these is a sufficient basis for jurisdiction because they do not mandate payment of money by the government. *See Carruth v. United States,* 627 F.2d 1068, 1081, 224 Ct.Cl. 422 (1980) (no jurisdiction based on

Fifth Amendment Due Process or Equal Protection) . . . .

*LeBlanc v. United States,* 50 F.3d 1025, 1028 (Fed.Cir.1995). *See also Inupiat Community of the Arctic Slope v. United States,* 230 Ct.Cl. 647, 662, 680 F.2d 122, 132, *cert. denied,* 459 U.S. 969, 103 S.Ct. 299, 74 L.Ed.2d 281 (1982); *Walker v. United States,* 40 Fed. Cl. 666, 671 (1998); *Gilchrist v. United States,* 33 Fed.Cl. 791, 806 & n. 16 (1995). However, the Federal Circuit also has pointed out that "[t]he presence of a constitutional issue does not erase the jurisdiction of the Court of Federal Claims based on a properly brought claim under the Tucker Act, or bar the court from considering the constitutional issue in the course of determining whether the discharge was wrongful." *Holley v. United States,* 124 F.3d 1462, 1466 (Fed.Cir.), *reh'g denied* (1997). The Federal Circuit had determined that Lieutenant Holley pled a monetary claim that satisfied the jurisdictional requirements of the Tucker Act, and proceeded to consider the alleged constitutional violations. *Id.* In the present case, the plaintiff pled that his discharge was improper and that he was entitled to a continuation of pay and allowances. Under the reasoning of *Holley,* the court may consider the claim that plaintiff's discharge lacked due process.

Plaintiff first argues that "one does not surrender his or her constitutional rights upon entering the military," quoting *Meinhold v. United States Department of Defense,* 123 F.3d 1275, 1286 (9th Cir.) (district court's memorandum opinion), *opinion amended,* 131 F.3d 842 (9th Cir.1997) (quoting *Beller v. Middendorf,* 632 F.2d 788, 810 (9th Cir.1980), *cert. denied sub nom. Beller v. Lehman,* 452 U.S. 905, 101 S.Ct. 3030, 69 L.Ed.2d 405 (1981)). However, the entire quotation from the source of the quoted proposition, *Beller v. Middendorf,* provides a broader context when all of the court's words are read: "While it is clear that one does not surrender his or her constitutional rights upon entering the military, the Supreme Court has repeatedly held that constitutional rights must be viewed in light of the special circumstances and needs of the armed forces. . . . Regulations which might infringe constitutional rights in other contexts may survive scrutiny because of military necessities."

*Beller v. Middendorf, id.* at 810–811 (citations omitted).

Plaintiff also cites cases from the United States Court of Appeals for the Second Circuit, which, however, involved the dismissal of cadets from academies for reasons other than physical disqualification. For example, in *Andrews v. Knowlton,* cadets in two separate actions, arising out of different circumstances, challenged their impending expulsions from the United States Military Academy. *Andrews v. Knowlton,* 509 F.2d 898, 900 (2d Cir.), *cert. denied,* 423 U.S. 873, 96 S.Ct. 142, 46 L.Ed.2d 105 (1975). Each cadet had a hearing before a board of officers. One cadet was found guilty of violating the Academy's Honor Code by cheating; the other cadet was found guilty of violating the Honor Code by lying. *Id.* at 903. The Second Circuit upheld the expulsions, noting that each cadet was afforded a hearing before a board of officers, were represented by counsel, were allowed to call and cross-examine witnesses, and were afforded the right to offer and object to the introduction of any evidence. *Id.* at 905.

The holdings of *Wasson* [*v. Trowbridge,* 382 F.2d 807 (2d Cir.1967) ] and *Hagopian* [*v. Knowlton,* 470 F.2d 201 (2d Cir.1972) ], while they dealt with dismissal proceedings because of excessive demerits, are equally controlling here where appellants were separated from the Academy for violation of the Honor Code. From their teaching, it is clear that before a cadet can properly be dismissed or separated from his service academy, he must have a hearing, be apprised of the specific charges against him, and be given an adequate opportunity to present his defense both from the point of view of time and the use of witnesses and other evidence. A military proceeding conducted within these bounds of procedural due process would be proper and immune from constitutional infirmity.

*Id.* at 905. The cases of *Andrews, Wasson,* and *Hagopian* all involved misconduct, rather than physical disqualification from an academy. Plaintiff, moreover, failed to cite or discuss decisions of the United States Court of Appeals for the Federal Circuit, which are binding precedent on this court.

In *Holley v. United States,* the Federal Circuit considered whether the discharge of Lieutenant Holley from the Army violated constitutional due process. Lieutenant Holley was a recent graduate of the United States Military Academy. He was given a general discharge (under honorable conditions) without a hearing before a board of officers. The reason stated on the discharge certificate was "Misconduct Moral or Professional Dereliction or in Interest of National Security." *Holley v. United States,* 124 F.3d at 1463–65. He was given notice and an opportunity to respond to allegations of illegal drug abuse, and in response submitted a statement to the discharge authority. *Id.* at 1464. Lieutenant Holley was a probationary officer, with less than five years of service. An Army regulation provided that probationary officers may be discharged without a hearing before a board of officers. *Id.* at 1469. In upholding the discharge, the Federal Circuit stated that:

> The threshold question is whether a general discharge under honorable conditions may be implemented for probationary officers solely with written notice and an opportunity to respond, but without a full adversary hearing, without violating the minimum process that is due under the circumstances.
>
> Precedent teaches that minimum due process is not violated by the procedure followed in discharging Mr. Holley. *See Department of Navy v. Egan,* 484 U.S. 518, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988) (minimum due process is met for employee discharge in security context by written notice and a pre-termination opportunity to respond).

*Id.* at 1469–70. Unlike Lieutenant Holley, whose general discharge as a result of allegations of illegal drug abuse was effected without a hearing, plaintiff in the present case was not defending against charges of misconduct and received an honorable discharge. Plaintiff received the same notice and opportunity to respond that was approved by the Federal Circuit in *Holley.*

Due process is a function of property and liberty interests. In a recent Court of Federal Claims case, the court stated:

Plaintiff asserts that the case review subcommittee took away both a property interest and a liberty interest without providing him due process. In *Canonica v. United States*, 41 Fed.Cl. 516 (1998), the court recently reviewed the due process rights of military personnel:

> Persons are entitled to due process before they can be deprived of property or liberty. Courts have held that an enlisted member of the armed forces does not have a property interest in his employment because he may be discharged "as prescribed by the Secretary" of his service. However, courts have held that an enlisted member of the armed forces has a liberty interest in his employment.
>
> This liberty interest prevents the military from discharging a service member without due process—but only in cases where a "stigma" would attach to the discharge.

*Id.* at 524 (citations omitted). These principles also apply to officers. Compare *Paskert v. United States*, 20 Cl.Ct. 65, 77 (1990) (case involving discharged Army captain; court held that "[s]ervice members have no constitutional rights to remain on active duty, and their rights are defined by the applicable statutes").

*Milas v. United States*, 42 Fed.Cl. 704, 711 (1999), *aff'd*, 217 F.3d 854 (Fed.Cir.1999) (table). Similarly, plaintiff cannot demonstrate a property interest in either the Naval Academy or military service. *See Stone v. Federal Deposit Ins. Corp.*, 179 F.3d 1368, 1374 (Fed.Cir.1999) ("To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.") (quoting *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)); *Doe v. Garrett*, 903 F.2d 1455, 1462 (11th Cir.1990) ("It is well established that a military officer's expectation of continued military employment does not rise to the level of a property interest unless it is rooted in some statute, regulation, or contract.... Courts have rejected claimed property inter-ests even in cases involving outright discharge from career positions in the military.") (citations omitted).

Nor has plaintiff raised a liberty interest through demonstrating that any stigma attached to the receipt of an honorable discharge based on physical disqualification. *Cf. Weaver v. United States*, 46 Fed.Cl. 69, 77 (2000) (stigma attaches when the discharge certificate reflects derogatory circumstances) (citing *Keef v. United States*, 185 Ct.Cl. 454, 467, 1968 WL 9154 (1968)); *Milas v. United States*, 42 Fed.Cl. at 708, 712 (the requirements of due process were satisfied where plaintiff was afforded a hearing before a board of officers, based on stigmatizing allegations of sexual abuse of his son and a proposed discharge under other than honorable conditions). Plaintiff has failed to demonstrate that 10 U.S.C. § 1217, which exempts academy cadets from the Retirement or Separation for Physical Disability provisions of Title 10, is unconstitutional. Plaintiff was afforded due process through notice and an opportunity to respond, and plaintiff chose to submit a statement, which was considered by the discharge authority. Both count three and count six of the complaint are dismissed for failure to state a claim upon which relief can be granted.

*Summary Judgment*

In addition to the defendant's motion to dismiss, the plaintiff and the defendant have filed cross-motions for summary judgment under Rule 56 of the Rules of the United States Court of Federal Claims. Summary judgment in this court should be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure and is similar both in language and effect. Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

RCFC 56(c) provides that in order for a motion for summary judgment to be granted,

the moving party must demonstrate that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Avenal v. United States,* 100 F.3d 933, 936 (Fed.Cir. 1996), *reh'g denied* (1997); *Creppel v. United States,* 41 F.3d 627, 630–31 (Fed.Cir.1994); *Meyers v. Asics Corp.,* 974 F.2d 1304, 1306 (Fed.Cir.1992); *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States,* 20 Cl.Ct. 674, 679 (1990), *aff'd,* 944 F.2d 885 (Fed.Cir.1991). A fact is material if it will make a difference in the result of a case. *Curtis v. United States,* 144 Ct.Cl. 194, 199, 168 F.Supp. 213, 216 (1958), *cert. denied,* 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959). Summary judgment "saves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is useless. 'Useless' in this context means that more evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the result." *Dehne v. United States,* 23 Cl. Ct. 606, 614–15 (1991) (citing *Pure Gold, Inc. v. Syntex, Inc.,* 739 F.2d 624, 626 (Fed.Cir. 1984)), *vacated on other grounds,* 970 F.2d 890 (Fed.Cir.1992); *United States Steel Corp. v. Vasco Metals Corp.,* 55 C.C.P.A. 1141, 394 F.2d 1009, 1011 (C.C.P.A.1968). Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 247–48, 106 S.Ct. 2505; *Lane Bryant, Inc. v. United States,* 35 F.3d 1570 (Fed.Cir.1994). Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. 2505; *see also Uniq Computer Corp. v. United States,* 20 Cl.Ct. 222, 228–29 (1990).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Ford Motor Co. v. United States,* 157 F.3d 849, 854 (Fed.Cir. 1998) (the nature of a summary judgment proceeding is such that the trial judge does not make findings of fact); *Cloutier v. United States,* 19 Cl.Ct. 326, 328 (1990), *aff'd,* 937 F.2d 622 (Fed.Cir.1991) (table). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250–52, 106 S.Ct. 2505. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In such a case, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

If, however, the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Id.* at 587–88, 106 S.Ct. 1348; *Wanlass v. Fedders Corp.,* 145 F.3d 1461, 1463 (Fed.Cir.), *reh'g denied* (1998); *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 163 (Fed.Cir. 1985); *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Conroy v. Reebok Int'l,*

*Ltd.,* 14 F.3d 1570, 1575 (Fed.Cir.1994), *reh'g denied* (1995); *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States,* 20 Cl.Ct. at 679. If the moving party makes such a showing, the burden then shifts to the nonmoving party to demonstrate that a genuine factual dispute exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. *See Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. 2548; *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States,* 20 Cl.Ct. at 679.

Pursuant to RCFC 56, a motion for summary judgment may succeed whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. 2548. Generally, however, in order to prevail by demonstrating that a genuine issue for trial exists, the nonmoving party will need to go beyond the pleadings by use of evidence such as affidavits, depositions, answers to interrogatories and admissions. *Id.*

Even if the parties allege an absence of genuine issues of material fact, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in the particular case. *Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed. Cir.1988) (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir. 1987)). After review of the parties' cross motions for summary judgment, the court agrees that there are no material factual disputes between the parties. Therefore, disposal of this case on summary judgment is appropriate.

### Presumption of Good Faith

A service member must "overcome the strong, but rebuttable, presumption that administrators of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith." *Doe v. United States,* 132 F.3d 1430, 1434 (Fed.Cir.1997) (quoting *Sanders v. United States,* 219 Ct.Cl. 285, 302, 594 F.2d 804, 813 (1979)). *See also Weaver v. United States,* 46 Fed.Cl. at 81. Plaintiff, however, argues that his "medical providers acted with malice and ulterior motive in recommending his discharge." Plaintiff relies on a letter to the editor in the December, 1989 issue of the *American Journal of Psychiatry,* submitted by certain of plaintiff's treating physicians, titled "Fluoxetine and Nortriptyline Combination Therapy." The letter to the editor refers to a "Mr. A," acknowledged by defendant to be the plaintiff. Plaintiff requests that the administrative record be supplemented with the letter to the editor and several expert medical reports which explain the letter in the context of plaintiff's case. Defendant submitted its own countering medical expert report. The letter to the editor was submitted by four medical personnel involved in the plaintiff's inpatient medical care at Bethesda Naval Hospital, including two members of the plaintiff's Medical Board. The letter was published in December 1989, some nine months after plaintiff's discharge from the Navy on March 27, 1989.

As plaintiff indicates, courts have permitted limited supplementation of an administrative record in disability retirement cases. Although the present case is not strictly a disability retirement case, plaintiff was disenrolled from the Naval Academy and discharged from the Naval Service based on his medical condition, and received a Veterans Administration disability rating and disability compensation, based on those same medical problems. This case shares other characteristics with disability retirement cases, such as the absence of an administrative hearing. *See Long v. United States,* 12 Cl.Ct. 174, 175–76 & 176 n. 1 (1987) ("The [*Brown v. United States* ] court reasoned that disability retirement records typically did not reflect administrative hearings, with the medical testing and evaluation typical of that process, and it allowed in evidence to fill gaps in the administrative record and provide post-separation information.") (citing *Brown v. United States,* 184 Ct.Cl. 501, 512, 396 F.2d 989, 995 (1968) (footnote omitted)). Courts also have permitted evidence beyond the record if "plaintiff makes a 'strong showing of bad faith or improper behavior' that creates 'serious doubts about the fundamental integrity' of the administrative action." *Wyatt v. Unit-*

*ed States,* 23 Cl.Ct. 314, 319 (1991) (quoting *Long v. United States,* 12 Cl.Ct. at 177 n. 2 (quoting *Sierra Club v. Costle,* 657 F.2d 298, 390 n. 450 (D.C.Cir.1981))). Plaintiff has made an allegation of bad faith associated with the December 1989 letter to the editor which allows examination. The court, therefore, will consider the medical expert reports from the parties, which include, in two instances, factual material from physicians who treated the plaintiff prior to his discharge from the Naval Service. *See Brown v. United States,* 396 F.2d at 996 ("The evidence we have considered to fill these gaps [in the administrative record] has been, in the vast majority of instances, expert medical testimony."). The court also will consider the letter to the editor of the *American Journal of Psychiatry,* which was not contained in the plaintiff's medical records, but reflects the views of some of plaintiff's treating physicians and Medical Board members. The letter states:

Sir: We wish to report a case in which there was a marked increase in the patient's serum level of nortriptyline following augmentation of this drug with fluoxetine [Prozac].

Mr. A [plaintiff], a 22–year–old white male college student, presented with a 9–month history of signs and symptoms consistent with major depression. These included profoundly depressed mood with diurnal variation, marked terminal insomnia, anhedonia, decreased appetite with a 5–lb weight loss, feelings of anxiety, poor concentration, and somatic concerns. The patient also met the *DSM–III–R* criteria for obsessive-compulsive disorder. He was admitted to our hospital after failing to respond adequately to outpatient trials of amitriptyline and desipramine. The results of a physical examination and laboratory studies, including thyroid function studies, were within normal limits.

Mr. A began taking nortriptyline, which was gradually increased to a dose of 100 mg/day; his serum level was 91 ng/ml after 5 days at the 100–mg/day dose. (Our laboratory considers therapeutic levels to be in the range of 50–150 ng/ml.) Additional medications included lorazepam, up to 3 mg/day, for anxiety and albuterol, as needed, for bronchospasm. After 1 month there had been only modest improvement, but the patient refused augmentation of his nortriptyljne with lithium. Fluoxetine was then started at 20 mg/day. After 10 days of the combined therapy, gradual improvement was noted, and Mr. A's serum level of nortriptyline was 229 ng/ml. The dose of nortriptyline was ultimately reduced to 50 mg/day; the corresponding serum level was 143 ng/ml. After several weeks of combined treatment and good response, during which time the lorazepam was discontinued, Mr. A was able to leave the hospital.

The increase in serum level of nortriptyline was remarkable. A computerized review of the literature revealed no systematic evaluations and only two case reports of the use of fluoxetine in combination with other antidepressants.... [W]e hypothesize that the increase in serum level may have resulted from competitive interference with hepatic metabolism of nortriptyline. It is unlikely that the other medications Mr. A used had a significant effect on the nortriptyline level, since he took these medications consistently both before and after fluoxetine augmentation.

This case indicates the need for caution and frequent serum level monitoring when combining fluoxetine and other antidepressant medications. (Citations omitted.)

Plaintiff argues that the letter to the editor provides "evidence that plaintiff suffered from a temporary condition caused by his treatment by military doctors which did not warrant plaintiff's discharge.... Furthermore, there are indications in the record of a rush to judgment in this case, and that plaintiff's medical providers acted with malice and ulterior motive in recommending his discharge." Plaintiff continues:

[I]t appears that plaintiff's medical providers retaliated against plaintiff for questioning their treatment of him and for that reason recommended his disenrollment from the U.S. Naval Academy and discharge from the Navy. Furthermore, there is the appearance that the doctors at Bethesda had an ulterior motive in dis-

charging plaintiff, and that illegal motive was to cover up their own medical ineffectiveness at best and malfeasance at worst. In fact, the letter to the editor does not reflect retaliation by plaintiff's medical providers. The letter suggests frequent monitoring when treatment includes both fluoxetine (Prozac) and other antidepressant medications such as nortriptyline, but does not conclude that the combination of medications was responsible for plaintiff's depression. Examining the words of the letter, plaintiff's attribution of ulterior motives to his medical providers and those responsible for his release from the Naval Academy appear to be baseless.

To draw the conclusion that plaintiff's depression stemmed from his treatment, plaintiff submitted a consultation report from Dr. Phillip E. Romero, a non-military psychiatrist. Dr. Romero advised that he had been consulted by the plaintiff's father in February 1989, the month before plaintiff's March 27, 1989 discharge. Dr. Romero believed that there was a likelihood plaintiff's depression was produced by the side effects of the medication being administered. There was no indication that Dr. Romero's input was provided to Navy officials by the plaintiff prior to the plaintiff's discharge. Dr. Romero believed that "[t]he pulmonary medications, Prednisone and Intal, and particularly Theophylline, Vancenase, and Proventil all very likely contributed to the psychiatric condition of depression." Extracts from the *1989 Physician's Drug Handbook,* submitted by the parties, do not list depression as a potential adverse reaction to either Intal, or Vancenase, or Proventil, but does list depression as a potential adverse reaction to theophylline. Plaintiff's treatment with theophylline was not discontinued until October 15, 1988. Dr. Romero also states that "[t]he dosing of nortriptyline (a sedating antidepressant) and Prozac (a stimulating antidepressant) may have worked at cross purposes producing side effects of insomnia, agitation and restlessness." Dr. Romero does not mention depression explicitly as a potential adverse reaction to nortriptyline and Prozac, nor does the extract from *The 1989 Physician's Drug Handbook* list depression as a potential adverse reaction to either nortriptyline or Prozac. Even if depression were so listed, that potential adverse reaction does not render it conclusive that any given individual, such as plaintiff, suffered the reaction from the antidepressant medications.

Plaintiff also submitted a letter from Dr. Brian C. Turrisi, a non-military pulmonary specialist, who examined plaintiff in March and April, 1988, prior to his discharge on March 27, 1989, and again in November 1994. Dr. Turrisi noted that plaintiff was "discharged with the diagnosis of depression with improving airway problems." Dr. Turrisi stated that "[i]t is a well known fact that particularly Theo–Dur [theophylline] and rarely Proventil can cause symptoms of irritability, sometimes depression, and various other somatic complaints, despite having normal drug levels." There was no indication that Dr. Romero's input was provided to Navy officials by the plaintiff prior to the plaintiff's discharge.

In addition, plaintiff submitted a medical expert report written by Dr. Peter R. Breggin, a psychiatrist who professes "a special interest and expertise in medication side effects." [29] Dr. Breggin interviewed the plaintiff in December 1995, subsequent to the plaintiff's discharge on March 27, 1989. Dr. Breggin believes that plaintiff's psychiatric problems, "at their worst, fell far short of 'severe' as the term is used in psychiatry," and that, even if plaintiff were suffering from Major Depression (Severe), "complete recovery would have been expected within a year." Dr. Breggin suggested plaintiff took medications "that could have caused psychiatric disorders" and "was probably suffering from a drug-induced psychiatric disorder which carries an even more hopeful prognosis." Dr. Breggin observed that plaintiff was taking Prozac and nortriptyline during his hos-

---

**29.** Dr. Breggin's numerous books include: *Psychiatric Drugs: Hazards to the Brain* (Springer Publ. Co.: 1983); *Toxic Psychiatry: Why Therapy. Empathy and Love Must Replace the Drugs, Electroshock and Biochemical Theories of the* *"New Psychiatry"* (St. Martin's Press: 1991); *Talking Back to Prozac* (St. Martin's Press: 1994); and *The Heart of Being Helpful: Empathy and the Creation of a Healing Presence* (Springer, NY: 1997).

pitalization, and that "Prozac can enormously increase the impact of nortriptyline; the combination cause effects similar to and even more severe than those of the sympathomimetic amines. These medications *commonly* produce anxiety, agitation, nervousness, and fearfulness. They can also produce depression." (emphasis in original). Dr. Breggin also suggested plaintiff was "exposed to severe stresses that in themselves caused him to be anxious and depressed," including the hospitalization itself and the threat of losing his naval career. Dr. Breggin concluded that plaintiff should not have been dismissed from the Naval Academy and that, "with proper diagnosis and treatment, Kenneth B. Golding would have been able to return to a successful career at the Academy and in the service."

Defendant countered with the medical report of Commander Kevin D. Moore, a Navy psychiatrist at the National Naval Medical Center, who was listed as the Admitting Physician for the plaintiff's hospitalization, but not as a treating physician. In a September 2, 1998 report submitted by the defendant, Commander Moore noted that:

> b. Golding had a significant medical history. His physical complaints had prevented him from performing in a manner expected of a midshipman at the USNA. He was provided increasing levels of care. Golding was treated by an outpatient psychiatrist after he failed treatment efforts by the multiple primary care providers and specialists. Golding was referred to inpatient psychiatric hospitalization after he failed outpatient mental health treatment. This admission took into account that a midshipman must be able to fulfill his duties. Golding was not able to perform his duties at the USNA. No partial hospitalization program was available, and no psychiatrist was stationed at the USNA clinic.

Commander Moore also stated that "[t]he medical record indicates that it was the stressors related to his environment at the USNA that had contributed to his disorder." Dr. Harold Silver, the civilian doctor consulted by the plaintiff, on March 8, 1988, similarly concluded that plaintiff's depression was partly a function of trying to recover while performing "physical and intellectual tasks full blast" at the Naval Academy.

Several months after his discharge, on June 19, 1989, plaintiff was seen by Dr. Irfan Kucukcetin for a VA disability examination. Dr. Kucukcetin's Veterans Administration diagnosis concurred with the Navy's: "Major depression—single episode, severe, without psychotic features" and "Obsessive compulsive personality disorder." The VA concluded that plaintiff's "Major depression" was service connected and warranted a ten percent disability rating. To support continued VA entitlements, on April 21, 1992, the plaintiff's mother submitted a statement indicating that the plaintiff "has been diagnosed with a Bipolar Disorder. After being treated by LCDR D. Auvil, M.D. for this condition, he is under the impression that my son could still suffer another episode which may warrant a return admission into the hospital." Plaintiff was examined on September 21, 1992 by Alex R. Kelly, M.D, a VA physician. Dr. Kelly's conclusion was "Atypical depression, single episode; now in remission." The VA determined that plaintiff's service-connected disabilities remained unchanged at a ten percent disability rating, despite no symptoms of depression being noted during his examination by Dr. Kelly, and the condition was deemed to be in remission.

The court's review of the medical expert opinions indicates that the plaintiff, at best, has been able to raise the possibility that side effects of his medications may have contributed to his depression, although he has not proven cause and effect. Plaintiff's allegation of malice on the part of his medical providers is unsupported in the record. Plaintiff, for example, reads too much into the letter to the editor, quoted verbatim earlier, which merely suggests frequent monitoring when treatment includes a combination of medications. Plaintiff has submitted for consideration expert medical analyses, discussed above, which were drafted for purposes of this litigation, some five years and more after his discharge from the Naval Service. Even these medical inputs, however, are understandably caveated by the doctors who submitted them: Dr. Romero, for

example, advised that nortriptyline and Prozac "may have worked at cross purposes"; Dr. Turrisi advised that theophylline "can cause symptoms of irritability, sometimes depression"; Dr. Breggin advised that Prozac "can enormously increase the impact of nortriptyline" and that the medications "can also produce depression." Dr. Breggin also acknowledged that the stress of hospitalization and concerns about his naval career could have caused plaintiff to be depressed; Commander Moore suggested that stress from the Naval Academy program itself contributed to plaintiff's depression. Dr. Breggin also advised that, at the worst, plaintiff's "complete recovery would have been expected within a year." These conditioned statements, provided years after plaintiff's discharge, fall short of a demonstrating malice on the part of plaintiff's medical providers or establishing cause and effect of the medication to plaintiff's medical condition.

*The Medical Board Report*

Plaintiff argues that the Medical Board Report on which his discharge was based violated Navy regulations in that it did not include a prognosis.[30] The Navy Medical Manual provides that:

(c) The narrative section of the board's report should be no more and certainly no less than a well written narrative summary and should answer the following questions:

(1) Why did the patient enter the hospital?

(2) What physical findings (negative and positive) were found?

(3) What were the results of pertinent laboratory and x-ray tests?

(4) What medical or surgical treatment was rendered?

(5) What was the current physical condition of the patent at the time the medical board report was written?

(6) What is the board's prognosis and recommendations concerning the disposition to be effected?

(7) What instructions were given to the patient, such as medication to be taken, physical restriction, etc.

(8) Have all conditions and abnormalities been recorded?

Plaintiff argues that the discharge authority:

[S]hould have been informed that plaintiff's disability was temporary rather than permanent but they were not so informed. This could have had, and likely would have had, a significant bearing on the decision of whether or not to discharge plaintiff, or whether to take another course of action, such as allowing plaintiff to recuperate from a temporary condition and continue in the service in a subsistence at home or other similar status.

In fact, plaintiff did recover completely.[31] Plaintiff went on to graduate from the University of Virginia. Had the Secretary of the Navy been informed that plaintiff's medical condition was temporary, a different decision likely would have resulted.

Plaintiff's Medical Board Report was a three and one-half page document, with sections containing a history of plaintiff's illness, plaintiff's past history, physical/laboratory results, mental status examination, inpatient hospital course of treatment, and recommendations. The Medical Board Report concluded that the "primary diagnosis was established as "Major Depression, Single Episode, Severe without Psychotic Features—DNEPTE [did not exist prior to entry on duty] (DSM III–R 296.23) manifested by depressed mood, psychomotor retardation,[32] insomnia, diminished concentration and feelings of worthlessness. The

---

**30.** Prognosis—"forecast as to the probable outcome of an attack of disease; the prospect as to recovery from a disease as indicated by the nature and symptoms of the case." *Dorland's Illustrated Medical Dictionary* 1359 (28th ed.1994).

**31.** There is little or no information in the record to establish that plaintiff has completely recovered. Obtaining a degree from an undergraduate institution, while instructive on some level,

does not resolve whether or not plaintiff was capable of completing requirements at the Naval Academy or is fit for military service.

**32.** Psychomotor retardation—"generalized slowing of mental and physical activity; seen in depression." *Dorland's Illustrated Medical Dictionary* 1450 (28th ed.1994).

secondary diagnosis was Obsessive Compulsive Personality Disorder—EPTE [existing prior to entry on duty] (DSM III–R 301.40) as manifested by perfectionism, excessive devotion to work and productivity, and inflexibility." The report also concluded that a number of the physical symptoms as distinguished from the depression or psychiatric symptoms were without organic basis. In terms of forecasting plaintiff's prognosis for recovery and restoration to duty, the Medical Board Report, in its concluding "Recommendations" section, stated that, in the Medical Board's opinion, plaintiff "has now received the maximum benefit of military hospitalization and treatment and that has not restored the patient to a duty status." Moreover, the Medical Board Report concluded that in its opinion "the patient is unable to return to full duty."

Plaintiff's response to the Medical Board Report emphasized to the discharge authority how close he was to degree completion (twenty-seven credit hours),[33] and suggested strategies that would restore him to duty at the Naval Academy in the near-term. One option offered involved convalescing at home for the remaining six months of the school year, returning to the Naval Academy for the following summer, then joining the following year's class for graduation. A second option plaintiff suggested involved convalescing for the six months and also the following summer, then joining the following year's class for graduation. A third option proposed by the plaintiff was to return to school immediately on a reduced course load, rather than convalescing at home, but taking an extra semester to graduate, with the next year's class. The Medical Board, in reviewing plaintiff's rebuttal, declined to change their recommendation for discharge. The Office of the Chief of Naval Personnel, in turn, recommended that plaintiff be discharged due to "major depression, single episode,[34] resolving," and the Office of the Secretary of the Navy, with the benefit of plaintiff's proposals for graduating with the following year's class, nevertheless discharged plaintiff on the basis of this same "single episode, resolving" diagnosis. The Medical Board Report had summarized plaintiff's extensive medical history, his outpatient mental health treatment, and hospitalization, had concluded that his complaints appeared to exceed organic causation, and that plaintiff would not benefit from further hospitalization. The Medical Board also included with its report the plaintiff's extensive medical records. The Navy, however, recommended discharging plaintiff, despite the indication that his medical condition was "resolving." Based on the Medical Board Report, including plaintiff's medical history and plaintiff's health records, the Navy Report evidenced concern about the uncertainties of how long it would take the plaintiff's medical condition to resolve itself, if at all, and how the plaintiff would function back in the stressful environment of the Naval Academy and the Naval Service.

Plaintiff also argues that the Medical Board was required to prepare a "surrebuttal," which the Board failed to do, in violation of regulations. The Navy Medical Manual provides that:

> (c) The member [patient] shall be afforded an opportunity to submit a statement in rebuttal to any portion of the [medical] board's report. If a member submits a statement in rebuttal, the board shall review same and make any change which is considered appropriate or prepare a statement in surrebuttal.

The language of the manual appears to provide discretion to the Medical Board to make changes to its report, or not, and to prepare a surrebuttal, or not, as the Board deems necessary. The Board was in compliance with the Manual when it wrote: "The patient's rebuttal has been reviewed. There are no changes in the findings or recommendations of the Board." Under the manual, the Board is not required to make changes,

---

**33.** Plaintiff actually needed a minimum of seventeen credit hours for graduation from the Naval Academy. An honors degree in political science required the twenty-seven credit hours.

**34.** Major depressive episode—"[DSM–III–R], a period of depressed mood with loss of interest or pleasure in one's usual activities." *Dorland's Illustrated Medical Dictionary* 569 (28th ed.1994).

or to comment, on a patient's response, if the response provided no new information or did not affect the Board's previous opinion. Although the plaintiff's prognosis and surrebuttal concerns, standing alone, do not assist his case, when combined with the Navy's failure to include the Chief of Medicine and Surgery in the discharge process, the concerns take on added significance, as indicated below.

*The Navy Chief of Medicine and Surgery*

 In a recent submission, in response to the court's inquiry, the plaintiff argues that "[i]t is legal error in this case, sufficient to void plaintiff's disenrollment and discharge, that the Medical Policy for Not–Physically Qualified USNA Midshipmen ... was violated. The Chief of Medicine and Surgery never made a final determination in this case. This Court should rightfully rule in plaintiff's favor on the basis of this issue." The Navy's Medical Policy for Not–Physically Qualified United States Naval Academy Midshipmen (hereafter, Navy Medical Directive), dated June 20, 1980, to which the plaintiff refers, provided that:

2. The Chief of Medicine and Surgery is charged with prescribing and ensuring candidates for naval service conform to specific medical standards. His determination is final as to whether a physical defect of a midshipman is to be considered disqualifying in accordance with the standards established in the Manual of the Medical Department. In such a case, the midshipman may not be commissioned in [sic] absence of a waiver granted by the Chief of Naval Personnel or the Commandant of the Marine Corps, as appropriate. Waivers will only be granted in those instances where it is determined by the Chief of Naval Personnel or the Commandant of the Marine Corps, after considering the recommendations of the Chief of Medicine and Surgery and the Superintendent of the Naval Academy, that the disqualifying defect is of such a nature as to not preclude the performance of duty.

The parties agree that the referenced Chief of Medicine and Surgery also is known as the Navy's Surgeon General, and reports to the Chief of Naval Operations. *See* 10 U.S.C. § 5137 (1994). The defendant acknowledges

that the Navy Medical Directive was in effect when the plaintiff was discharged on March 27, 1989, and that the Navy had procedures in place to insure that a review of Medical Board Reports would take place. However, after direction to search the files issued by the court, the parties have stipulated that the administrative record filed in this case does not reflect that the Chief of Medicine and Surgery, or any personnel in the Bureau of Medicine and Surgery, "reviewed plaintiff's case or made any final determination as to plaintiff's ability to return to the U.S. Naval Academy to complete his studies and be commissioned as a naval officer."

Due to the importance of this issue, the court afforded the parties the opportunity to file supplemental briefs addressing the role of the Navy's Chief of Medicine and Surgery, which were received on December 4 and 12, 2000. Defendant also filed, on December 11, 2000, a declaration by a military personnel management specialist who reviews proposed administrative actions regarding Naval Academy midshipmen. The specialist indicated in her sworn declaration that, "[i]n the ordinary course of business, following endorsement by the Superintendent of the Naval Academy, a Midshipman being processed for separation would have his separation package with endorsements reviewed by a functionary of the Chief of Medicine and Surgery. Following review by the Chief of Medicine and Surgery the package would be delivered to Commander Naval Personnel and subsequently to the Secretary of the Navy or his designate." The specialist further indicated that it would take approximately ninety days to complete a search of Navy records for any indication that the Chief of Medicine and Surgery, or a person in the Bureau of Medicine and Surgery, had reviewed the plaintiff's Medical Board. Over the objection of the plaintiff, the court afforded defendant additional time needed to conduct a proper search of military personnel records. On January 24, 2001, defendant advised the court that its search had been concluded, and that no evidence was found that the Chief of Medicine and Surgery, or any person in the Bureau of Medicine and Surgery, had reviewed the plaintiff's Medical Board Report and provid-

ed an input on his discharge from the Naval Academy and the Navy.

Prior to its unsuccessful search of military personnel records, the defendant had argued that the Navy should be presumed to have followed its standard procedures, with a Bureau of Medicine and Surgery review of the plaintiff's Medical Board Report. For this argument, defendant relied on principles of administrative regularity in its processing of military personnel actions, citing the United States Court of Claims in *Sanders v. United States*, 219 Ct.Cl. 285, 594 F.2d 804 (1979), for the "presumption that administrators of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith." *Id.* at 302, 594 F.2d at 813. There is, however, in the case before this court, probative evidence to overcome the rebuttable presumption of administrative regularity. *See Kelly v. United States*, 826 F.2d 1049, 1053 (Fed.Cir.1987) (a case in which probative evidence rebutted the presumption of administrative regularity).

Not only did the defendant's search not produce any indication that the Bureau of Medicine and Surgery reviewed the Medical Board Report, but the documents that were found in the administrative record reflect that the Bureau was not part of the plaintiff's discharge process. The plaintiff's Medical Board Report with his medical records and rebuttal were submitted, as indicated on the face of the cover sheet of the report, to the Superintendent of the Naval Academy through the Convening Authority of the Medical Board. The Superintendent submitted the plaintiff's Medical Board Report to the Secretary of the Navy, through the Chief of Naval Personnel. The Chief of Naval Personnel submitted the Medical Board Report to the Office of the Secretary of the Navy. The Secretary of the Navy's designate discharged the plaintiff and forwarded the notice of the discharge to the plaintiff through the Chief of Naval Personnel and the Superintendent of the Naval Academy. The Superintendent provided the notice of discharge to the plaintiff by letter dated March 27, 1989. This series of letters effecting plaintiff's discharge reflect that the Bureau of Medicine and Surgery was not part of

the discharge process. A presumption of Bureau review flies in the face of the absence of any evidence of such review found in the Navy's search of personnel records, even though all of the other endorsements referenced above were found, and, moreover, the face of the endorsements themselves reflect an unbroken chain of custody of the plaintiff's Medical Board Report up to the Office of the Secretary of the Navy and down again to the plaintiff, without benefit of review and consideration by the Bureau of Medicine and Surgery.

Traditionally, courts have accorded deference to the personnel decisions of the military and have been reluctant to interfere with the authority of the executive in military and national security affairs. *Voge v. United States*, 844 F.2d 776, 779 (Fed.Cir.1988), *cert. denied*, 488 U.S. 941, 109 S.Ct. 365, 102 L.Ed.2d 355 (1988). An oft repeated theme in military pay cases is that "[t]he merits of a service secretary's decision regarding military affairs are unquestionably beyond the competence of the judiciary to review." *Adkins v. United States*, 68 F.3d 1317, 1322 (Fed.Cir.1995), *reh'g denied* (1996); *Murphy v. United States*, 993 F.2d 871, 872 (Fed.Cir. 1993), *cert. denied*, 511 U.S. 1019, 114 S.Ct. 1402, 128 L.Ed.2d 75 (1994), *reh'g denied*, 511 U.S. 1118, 114 S.Ct. 2123, 128 L.Ed.2d 681 (1994) (quoting *Orloff v. Willoughby*, 345 U.S. 83, 93–94, 73 S.Ct. 534, 97 L.Ed. 842 (1953), *reh'g denied*, 345 U.S. 931, 73 S.Ct. 779, 97 L.Ed. 1360 (1953)). However, as stated in *Murphy v. United States:*

When the military is given unlimited discretion by Congress, it is nevertheless bound to follow its own procedural regulations if it chooses to implement some. But the utility of the distinction between procedural and substantive matters in assessing a court's ability to review military decisions should not be overemphasized. On procedural matters, the test or standard is inherent. A court may appropriately decide whether the military followed procedures because by their nature the procedures limit the military's discretion. The court is not called upon to exercise any discretion reserved for the military, it merely determines whether the procedures

were followed by applying the facts to the statutory or regulatory standard.

*Murphy v. United States*, 993 F.2d at 873 (citation omitted). The Federal Circuit in *Murphy* cited *Sargisson*, in which the court stated, "once the Secretary promulgated regulations and instructions and made them the basis for [the service member's] release, his action became subject to judicial review for compliance with those regulations and instructions, even though he was not required to issue them at all." *Sargisson v. United States*, 913 F.2d 918, 921 (Fed.Cir.), *reh'g denied* (1990). The court in *Voge v. United States* offered similar guidance, stating that, "[i]t has long been established that government officials must follow their own regulations, even if they were not compelled to have them at all . . . ." *Voge v. United States*, 844 F.2d at 779.

Defendant, however, argues that if the Bureau of Medicine and Surgery did not review plaintiff's Medical Board Report, the omission is harmless error. Defendant describes any such omission as "mere technical error." Defendant continues: "The error must be in violation of a 'mandatory published procedure of a substantive nature by which plaintiff has been severely prejudiced.' *Gallucci v. United States*, 41 Fed.Cl. 631, 643 (1998); *Krauss v. United States*, 40 Fed.Cl. 834, 838 (1998) (quoting *Sanders [v. United States*, 219 Ct.Cl. 285,] 298, 594 F.2d [804,] 811 [(1979)], [*aff'd*, 185 F.3d 886 (Fed.Cir.1999) (table)])."

The cases cited above by the defendant reiterate the rule, but do not otherwise materially support the defendant's conclusions. In *Gallucci*, for example, a military officer challenged the voluntariness of his resignation, arguing that he was not informed that Marine Corps Order 1900.16D provided for requesting the withdrawal of a resignation within a certain number of days. *Gallucci v. United States*, 41 Fed.Cl. at 640. The court determined that the voluntariness of the officer's resignation was not impacted by his lack of knowledge of the order. *Id.* at 641. In contrast, in the present case, the plaintiff did not voluntarily resign, and does not claim a lack of knowledge of regulations, but a failure of the senior medical officer to conduct an independent review of a proposed discharge based on physical disqualification.

In *Krauss*, a Navy reserve officer argued that he was improperly denied both a Medical Board and a Physical Evaluation Board, in violation of a Navy instruction and the Navy's Manual of the Medical Department. *Krauss v. United States*, 40 Fed.Cl. at 837, 839, 842. The court found that substantial evidence supported the Navy Board for Correction of Naval Records' conclusion that these regulations were not violated because the service member was fit for duty. *Id.* at 843. Here, in contrast, the court has found that the Navy Medical Directive was violated, in that the required review and determination by the Navy's Chief of Medicine and Surgery in plaintiff's case was not conducted.

In *Sanders*, the Air Force Board for Correction of Military Records voided four officer performance reports, but did not void promotion passovers before selection boards that considered the defective performance reports either through inadvertence or mistake. *Sanders v. United States*, 219 Ct.Cl. at 292–93, 594 F.2d at 808. The violation of a military regulation, however, was not at issue in *Sanders:* "[N]o serious error, such as violation of a regulation or published mandatory procedure by the Correction Board, has ever been alleged in this case, which is one more in the nature of failure to correct an obvious injustice." *Id.* at 298, 594 F.2d at 811. The United States Court of Claims in *Sanders* ruled for the plaintiff, based on the failure of the selection boards to evaluate the military officer on the basis of personnel records portraying his service career on a fair and equitable basis, as required by statute. *Id.* at 302–03, 314, 594 F.2d at 814, 820.

The Court of Claims in *Sanders*, *id.* at 298, 594 F.2d at 811, cited the *Skinner* case, which did involve violation of a military regulation. In *Skinner*, a military officer was relieved from active duty as a result of being nonselected for permanent major before two promotion boards. *Skinner v. United States*, 219 Ct.Cl. 322, 325, 594 F.2d 824, 826 (1979). The court found for the plaintiff, based on a failure of the military to comply with Air Force Manual 36–10. *Id.* at 827–28. The defendant's failure to follow "its published

procedures is reversible for legal error where those procedures are required and their violation is substantial and prejudicial." *Id.* at 329, 594 F.2d at 828 (citations omitted). Similarly, the issue in the present case is whether the violation of the Navy Medical Directive is substantial and prejudicial.

Although courts review military decisions for violation "of a regulation or published mandatory procedure," *Sanders v. United States,* 219 Ct.Cl. at 298, 594 F.2d at 811, there is no requirement that the military regulation or procedure be published in the Federal Register in order to warrant compliance. Nor has the defendant in this case argued that the Navy Medical Directive was without force and effect because it had not been published in the Federal Register. In *Gallucci,* cited by the defendant and discussed above, the Marine Corps Order had not been published in the Federal Register. *Gallucci v. United States,* 41 Fed.Cl. at 640. Similarly, in *Krauss* the Navy's Instruction and Manual of the Medical Department, and in *Skinner* the Air Force Manual had not been published in the Federal Register. *Krauss v. United States,* 40 Fed.Cl. at 839–40, 842; *Skinner v. United States,* 219 Ct.Cl. at 327, 594 F.2d at 827–28. *Accord Murphy v. United States,* 993 F.2d 871, 872 n. 2, 873 (Fed.Cir.), *reh'g denied* (1993) (Air Force Regulation 36–12 had not been published in the Federal Register), *cert. denied,* 511 U.S. 1019, 114 S.Ct. 1402, 128 L.Ed.2d 75, *reh'g denied,* 511 U.S. 1118, 114 S.Ct. 2123, 128 L.Ed.2d 681 (1994); *Dodson v. United States,* 988 F.2d 1199, 1204 (Fed.Cir.), *reh'g denied* (1993) (Army Qualification Management Program Regulations 600–200, 601–280, 623–205, 635–200 had not been published in the Federal Register, although the Army, having promulgated the Program Regulations, was required to comply with them); *Sargisson v. United States,* 913 F.2d 918, 921 (Fed.Cir.), *reh'g denied* (1990) (Air Force Regulation 36–12, as noted above in *Murphy,* had not been published in the Federal Register); *Voge v. United States,* 844 F.2d 776, 779 (Fed.Cir.1988) (Secretary of the Navy Instruction 7220.75B had not been published in the Federal Register; the Navy must follow its regulations, although not compelled to have them in the first place), *cert. denied,*

488 U.S. 941, 109 S.Ct. 365, 102 L.Ed.2d 355 (1988).

The United States Court of Appeals for the Federal Circuit outlined the following test for whether procedures should be accorded the force and effect of law:

> (1) the promulgating agency was vested with the authority to create such a regulation; (2) the promulgating agency conformed to all procedural requirements, if any, in promulgating the regulation; (3) the promulgating agency intended the provision to establish a binding rule; and (4) the provision does not contravene a statute. In determining whether a provision was intended to be binding, the court should consider (a) whether the language of the provision is mandatory or advisory; (b) whether the provision is "substantive or interpretative"; (c) the context in which the provision was promulgated; and (d) any other extrinsic evidence of intent.

*Hamlet v. United States,* 63 F.3d 1097, 1105 (Fed.Cir.1995), *cert. denied,* 517 U.S. 1155, 116 S.Ct. 1542, 134 L.Ed.2d 646 (1996). In *Hamlet,* the court wrote, "several courts have held that an agency manual or handbook can be a binding agency regulation." *Id.* at 1103–04 (discussing as examples *Service v. Dulles,* 354 U.S. 363, 374–76, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *Vitarelli v. Seaton,* 359 U.S. 535, 538–40, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); *Thorpe v. Housing Authority of Durham,* 393 U.S. 268, 274–76, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969)).

Under the test in *Hamlet,* the Navy Medical Directive is entitled to the force and effect of law. The Navy was vested with the authority to issue such directives under the authority of 5 U.S.C. § 301 (1988). *See, e.g., Schism et al. v. United States,* 239 F.3d 1280, 1282–84, 1288–90 (Fed.Cir.2001) (discussing the Navy's Manual of the Medical Department, which was issued under the broad authority all military secretaries possess to manage their departments pursuant to 5 U.S.C. § 301 (1994), and which was not published in the Federal Register). The Navy was not required by the Administrative Procedure Act (APA) to publish the Navy Medical Directive in the Federal Register, as a

matter "related solely to the internal personnel rules and practices of an agency," 5 U.S.C. § 552(b)(2) (1988). The APA also provides that rule making relating to "a military ... function of the United States," 5 U.S.C. § 553(a)(1) (1988); matters "relating to agency management or personnel," 5 U.S.C. § 553(a)(2) (1988); and "rules of agency organization, procedure, or practice," 5 U.S.C. § 553(b)(3)(A) (1988), are all exempt from notice and comment requirements. *See, generally, Hamlet v. United States*, 63 F.3d at 1103. The Navy Medical Directive also does not contravene a statute, and is written in language with a mandatory tone to it ("The Chief of Medicine and Surgery is charged with prescribing and ensuring candidates for naval service conform to specific medical standards. His determination is final as to whether a physical defect of a midshipman is to be considered disqualifying in accordance with the standards established in the Manual of the Medical Department.") Nor, as indicated above, has the defendant suggested that the Navy considered the language as anything other than mandatory.

Defendant also cites *Hary v. United States*, for the proposition that "[a] finding of probable error or injustice cannot be based on mere speculation." *Hary v. United States*, 223 Ct.Cl. 10, 24 n. 18, 618 F.2d 704, 711 n. 18 (1980). Defendant contends that the Office of the Secretary of the Navy "had the benefit of a medical board report prepared by three Navy doctors, as well as Mr. Golding's rebuttal," and that plaintiff's "speculation that a reviewer assigned directly to the Bureau of Medicine [and Surgery] and less familiar with the case, would have reached a contrary conclusion is insufficient to overcome the substantial medical evidence that supported the Assistant Secretary's decision." The United States Court of Claims in *Hary* briefly mentioned the issue defendant relies on in a footnote. In *Hary*, the plaintiff had complained of proceedings taken against him pursuant to Air Force regulation, but the court noted that there was no evidence that the promotion boards which nonselected the officer were even aware of the earlier, presumably adverse, proceedings. *Id.* In the present case, defendant assigns as mere speculation the possibility that the Bu-

reau of Medicine and Surgery would have deviated from the Medical Board Report.

Plaintiff argues that the Navy's error in denying the mandatory review of his medical case by the Navy's highest-ranking doctor was not harmless. Plaintiff did not argue fundamental error. *See Porter v. United States*, 163 F.3d 1304, 1318 (Fed.Cir.1998) (citing *Evensen v. United States*, 228 Ct.Cl. 207, 654 F.2d 68 (1981); *Doyle v. United States*, 220 Ct.Cl. 285, 599 F.2d 984, *opinion amended*, 220 Ct.Cl. 326, 609 F.2d 990 (1979), *cert. denied*, 446 U.S. 982, 100 S.Ct. 2961, 64 L.Ed.2d 837 (1980)), *cert. denied*, 528 U.S. 809, 120 S.Ct. 41, 145 L.Ed.2d 37 (1999). Although the Chief of Medicine and Surgery was assigned a key role in the discharge process and was omitted from the process, the error falls short of the sort of selection board composition errors depicted in the two United States Court of Federal Claims cases cited above by the Federal Circuit in *Porter*. *Evensen v. United States*, 228 Ct.Cl. at 210, 213, 654 F.2d at 70, 72; *Doyle v. United States*, 220 Ct.Cl. at 296–300, 317, 599 F.2d at 992–94, 1003–04.

The United States Court of Appeals for the Federal Circuit has determined that the harmless error test has no application in cases involving Special Selection Boards created by special statute; however, the present case does not involve such a Board. *See Porter v. United States*, 163 F.3d at 1304, 1312, 1323–24, 1325. The harmless error test places on the defendant the burden of producing substantial evidence to demonstrate it would be unlikely that a service member would, for example, have been promoted or retained regardless of the government error. *Id.* at 1317 (citing *Sanders v. United States*, 594 F.2d at 818). The Federal Circuit, in *Porter*, further illustrated the harmless error test with the case of *Engels v. United States:*

The [*Engels* ] court restated the [harmless error] rule to clarify that the burden on the officer [the plaintiff] is to make a prima facie showing of nexus between the alleged error in his record and the passover decision. *Engels*, 678 F.2d at 175. The final burden of persuasion "falls to the Government to show harmlessness—that, despite

the plaintiff's prima facie case, there was no substantial nexus or connection." *Id.* *Porter v. United States,* 163 F.3d at 1318 (quoting *Engels v. United States,* 230 Ct.Cl. 465, 468, 678 F.2d 173, 175 (1982)). *See also* *Porter v. United States,* 163 F.3d at 1318 (citing *Hary v. United States,* 223 Ct.Cl. 10, 15–16, 20–21, 618 F.2d 704, 707, 709–10 (1980)).

Plaintiff has argued that the failure of the Navy to follow its own Medical Directive omitted the Navy's highest ranking medical doctor from the plaintiff's discharge action. Once plaintiff demonstrates a nexus between his discharge and violation of the regulation, defendant has the burden of demonstrating that the violation would not have changed the outcome and, thus, was harmless. The Navy Medical Directive assigned a key role in the discharge process to the Chief of Medicine and Surgery. Pursuant to the Medical Directive, the Chief of Medicine and Surgery is charged with the responsibility to ensure that midshipmen meet the Navy's medical standards, and to determine whether a midshipmen's physical defects are considered disqualifying from continued service. The review of the Chief of Medicine and Surgery would appear to be critical in all cases of physical disqualification, as the only medical officer in the discharge process, above the officer who convened the Medical Board, reviewing the Medical Board Report. The review of the Chief of Medicine and Surgery would appear to be particularly critical in this case, since it was concluded that the plaintiff's condition was resolving, there is in the record some conflicting evidence regarding the side effects of some of the drugs administered to plaintiff, plaintiff was within seventeen semester hours of graduation, and plaintiff was contesting the Medical Board Report. It is not remarkable that the Navy's chief medical officer would be placed in the discharge process by the Navy Medical Directive. It is remarkable that the chief medical officer would be omitted from a discharge process based on physical disqualification. The court will not ascribe to the Chief of Medicine and Surgery a superficial or "rubber stamp" role in the discharge process, or a role easily ignored or omitted without consequence, particularly in the face of the characterization of a critical role for the Chief of Medicine and Surgery in the Navy Medical Directive itself: "The Chief of Medicine and Surgery is charged with prescribing and ensuring candidates for naval service conform to specific medical standards. His determination is final as to whether a physical defect of a midshipman is to be considered disqualifying in accordance with the standards established in the Manual of the Medical Department."

Since the Chief of Medicine and Surgery was the Navy's senior medical doctor, as well as the only medical doctor in the review chain, above the convening authority for the Medical Board, the court concludes that the Chief of Medicine and Surgery could potentially have had a powerful impact on the discharge authority. Presuming that the review of the Chief of Medicine and Surgery would not have been perfunctory, but meaningful, issues surrounding the plaintiff's physical disqualification warranted a senior review by a medical professional above the Medical Board level. The Medical Board Report, by way of a prognosis, stated that the plaintiff "has now received the maximum benefit of military hospitalization and treatment and that has not restored the patient to a duty status" and concluded that "the patient is unable to return to full duty," in other words the prognosis was uncertain regarding when plaintiff would be well enough to meet all the requirements to do so. Both the Office of the Chief of Naval Personnel and the Office of the Secretary of the Navy, without the benefit of the Chief of Medicine and Surgery, somehow gleaned from the medical file that plaintiff's condition was "resolving," yet chose to discharge plaintiff. The Medical Board reviewed the plaintiff's rebuttal of its report, but declined to provide a substantive evaluation of the rebuttal, stating merely: "There are no changes in the findings or recommendations of the board." Moreover, the discharge authority, believing that plaintiff's condition was resolving, nevertheless had no medical input on the plaintiff's proposals, which all involved graduating from the Naval Academy the following fall or spring semesters. A senior medical officer review would have been able to assist the

discharge authority due to the size of the plaintiff's medical records, reflecting the extensive treatment provided by a variety of care givers.

Nor did the discharge authority have the benefit of the Chief of Medicine and Surgery's review of the plaintiff's extensive medication throughout his treatment and at the time of his admission to the Navy hospital for inpatient treatment—Ventolin, Intal, Vancenase, Humibid, Proventil, Restoril, and Theo-Dur—and the continuation of the latter three medications during the hospitalization. Depression is listed as a potential adverse reaction to both Restoril and Theo-Dur in *The 1989 Physician's Drug Handbook.*[35] Plaintiff was prescribed Restoril on September 22, 1988, and was taken off the medication on October 14, 1988. Plaintiff's Theo-Dur also was discontinued during his hospitalization, on October 15, 1988, after over ten months on the medication.[36] Plaintiff's medical records reflect that on October 19, 1988, Dr. Sarlin agreed with the discontinuation of theophylline (Theo-Dur), "since it probably has a minimal effect on his [symptoms] [and] may be potentially toxic." Though Theo-Dur is "potentially toxic," theophylline levels were only checked twice, on December 23, 1987 and September 30, 1988, and there was disagreement among care givers, with one doctor recommending an increase in the dosage, and other doctors recommending that the medication be discontinued. Under these facts, the role of the Chief of Medicine and Surgery is deemed by the court to be critical to the discharge process.

The Medical Board Report concluded with a diagnosis of major depression due to the medical judgment that there was insufficient organic basis to explain all of plaintiff's symptoms and limitations. The reviews by the Office of the Chief of Personnel and the Assistant Secretary of the Navy for Manpower and Reserve Affairs did not afford plaintiff an informed evaluation of his extensive records and this medical judgment. Plaintiff was prejudiced by the omission of the senior medical officer from the process, in general and also following his rebuttal submission

after receiving the Medical Board Report. A senior physician such as the Chief of Medicine and Surgery, removed from the day-to-day treatment of the plaintiff, might have come to a different conclusion and recommendation to the discharge authority regarding the impact of plaintiff's medication, as to whether there was insufficient organic basis to explain plaintiff's physical symptoms, and whether a brief convalescence could possibly lead to the plaintiff resuming duties at the Naval Academy. Under the facts of this particular case, the court finds that the Chief of Medicine and Surgery was required by the Navy Medical Directive to be part of the plaintiff's discharge/retention process; that the Chief of Medicine and Surgery was nevertheless erroneously omitted from that process; that the plaintiff has demonstrated a nexus between his discharge and the violation of Navy Medical Directive, and the defendant has failed to carry its burden of demonstrating by substantial evidence that the plaintiff would have been discharged whether or not the Chief of Medicine and Surgery engaged in the role prescribed by the Navy Medical Directive. Count one of the plaintiff's complaint contends that the Navy violated its own regulations. The court agrees, and finds the error to have been substantial and prejudicial, and, therefore, not harmless.

## CONCLUSION

■ Based on a review of the extensive record in this case and the governing law, and for the foregoing reasons, the court, hereby, **GRANTS** the defendant's motion to dismiss counts two through count six of the complaint for failure to state a claim upon which relief can be granted. Count four is additionally dismissed for lack of jurisdiction in this court. The court **DENIES** the defendant's motion for summary judgment, and **GRANTS** the plaintiff's motion for summary judgment on count one of the complaint, for the defendant's failure to comply with its own directive. Plaintiff's remedy is limited to back pay for his term of service as a midship-

---

**35.** *The 1989 Physician's Drug Handbook* 915, 931.

**36.** Plaintiff was hospitalized on September 26, 1988, and discharged December 5, 1988.

man at the United States Naval Academy, and does not include pay for commissioned service, which he was never offered and in which he never served. As noted earlier, the United States Supreme Court stated in *Orloff v. Willoughby,* 345 U.S. at 90, 73 S.Ct. 534: "It is obvious that the commissioning of officers in the Army is a matter of discretion within the province of the President as Commander in Chief. Whatever control courts have exerted over tenure or compensation under an appointment, they have never assumed by any process to control the appointing power either in civilian or military positions."

**IT IS SO ORDERED.**